IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JUDY ENDERS/MADEN,       )
      )
        Plaintiff,     )
     v.       )     C.A. No. 05-669 (JJF)
      )
SUPER FRESH,      )
        Defendant.   )
      )
      )

# APPENDIX TO DEFENDANT'S OPENING BRIEF IN SUPPORT OF IT'S MOTION FOR SUMMARY JUDGMENT

William W. Bowser, Esquire (Bar I.D. 2239)
Margaret M. DiBianca, Esquire (Bar I.D. 4539)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone:  (302) 571-5008
Facsimile :  (302) 576-3476
wbowser@ycst.com; mdibianca@ycst.com
Attorneys for Defendants

**OF COUNSEL**
PROSKAUER ROSE LLP
John P. Barry, Esq. (JPB-6489)
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
973.274.3299
jbarry@prosauker.com
Attorneys for Defendant
Admitted *Pro Hac Vice*

DATE: February 15, 2007

       

# TABLE OF CONTENTS

## DEFENDANT'S APPENDIX DOCUMENTS

Charge of Discrimination..............................................................................................A1

Deposition Testimony of Judy Enders/Maden.............................................................A2

Super Fresh District List ..........................................................................................A24

Harassment Policy ....................................................................................................A25

Internal Complaint Policy ........................................................................................A28

Local 56 Union Contract............................................................................................A32

# TABLE OF CONTENTS

## COMPENDIUM OF UNREPORTED CASES

*Calloway v. E.I. DuPont de Nemours & Co.,*
    2000 U.S. Dist. LEXIS 12642
    (D. Del. 2000) ...........................................................................................................1

*Childress v. Dover Downs, Inc.,*
    2000 U.S. Dist. LEXIS 4881
    (D. Del. 2000) ...........................................................................................................2

*Edwards v. Chester Upland Sch. Dist.,*
    No. Civ. A. 96-7162, 1999 WL 179693
    (E.D. Pa. March 24, 1999) .........................................................................................3

*Verdin v. Weeks Marine Inc.,*
    No. 03-4571, 2005 U.S. App. LEXIS 2649
    (3d Cir. Jan. 25, 2005) ..............................................................................................4

*Wooley v. Colonial Sch. Dist.,*
    1993 U.S. Dist. LEXIS 19110
    (D. Del. 1993) ...........................................................................................................5

# TABLE OF CONTENTS

## DEFENDANT'S APPENDIX DOCUMENTS

Charge of Discrimination..................................................................................... A1

Deposition Testimony of Judy Enders/Maden.............................................. A2

Super Fresh District List ................................................................................. A24

Harassment Policy ........................................................................................... A25

Internal Complaint Policy .............................................................................. A28

Local 56 Union Contract................................................................................. A32

# TABLE OF CONTENTS

## COMPENDIUM OF UNREPORTED CASES

*Calloway v. E.I. DuPont de Nemours & Co.,*
    2000 U.S. Dist. LEXIS 12642
    (D. Del. 2000) ...........................................................................................................1

*Childress v. Dover Downs, Inc.,*
    2000 U.S. Dist. LEXIS 4881
    (D. Del. 2000) ...........................................................................................................2

*Edwards v. Chester Upland Sch. Dist.,*
    No. Civ. A. 96-7162, 1999 WL 179693
    (E.D. Pa. March 24, 1999) ........................................................................................3

*Verdin v. Weeks Marine Inc.,*
    No. 03-4571, 2005 U.S. App. LEXIS 2649
    (3d Cir. Jan. 25, 2005) .............................................................................................4

*Wooley v. Colonial Sch. Dist.,*
    1993 U.S. Dist. LEXIS 19110
    (D. Del. 1993) ...........................................................................................................5

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

| | ENTER CHARGE NUMBER |
|---|---|
| ☐ FEPA | 04C12674 |
| ☐ EEOC | 17CA400260 |

**Delaware Department of Labor** and EEOC

(State, or local Agency, if any)

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Judy Ann Enders/Maden | (302) 791-9467 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1 Laurel Ave  Wilmington DE 19809  NCC | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME | NO. OF EMPLOYEES OR MEMBERS 100+ | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| Superfresh Supermarket | | (302) 798-4557 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 2105 Philadelphia Pike  Claymont, DE  19703 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ AGE

☐ RETALIATION  ☐ DISABILITY  ☒ OTHER (Specify)
Equal Pay Act

| DATE DISCRIMINATION TOOK PLACE |
|---|
| EARLIEST 12/16/02  LATEST 8/16/2003 |
| ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

I. I am a female individual who began working for Respondent on 08/31/98 most recently as a Meat Wrapper. In the winter of 2001 I became pregnant and began experiencing disparate treatment from my supervisor when he scrutinized my work and the amount of time I spent on break. I went out on maternity leave in March of 2002. When I returned to work in Winter of 2002 I submitted a vacation schedule and was subjected to harassment from my supervisor, Rich Elliot (male, Meat Manager) regarding this request. From this point on I was subjected to disparate treatment by Mr. Elliot and not afforded the same opportunities as my male co-workers. I was harassed on a daily basis which culminated in a hostile work environment and my leaving on medical leave in August of 2003. During this period of time, I was not granted permission to leave work early when problems arose or approved for vacation time whereas my male counterparts were afforded the opportunity to leave early when they request to do so and always approved for their requested vacation schedules.
II. Respondent has not provided an explanation for this disparate treatment.
III. I believe I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as ammended based upon my gender (female) because: 1. All of my male co-workers are granted their vacation requests and afforded the opportunity to leave early if a problem arises; I am not approved for vacation nor am I allowed to leave early if a problem arises;  2. Mr. Elliot only scrutinized the amount of time I took for my breaks and did not monitor my male co-workers;  3. When I submitted my vacation requests upon retuning from maternity leave, Mr. Elliot stated he lost my request, but then stated he threw it away because he didn't know who it belonged to,  4. Mr. Elliot would not approve my leave requests and would schedule me to work regardless of my requests,  5. I was the only employee of the meat department scheduled to work 3 nights a week whereas all my male co-workers were only scheduled to work 1 night per week,  6. Mr. Elliot would frequently yell at me in front of customers and did not yell at my male co-workers at any time, 7. Shortly before going out on medical leave at the end of August 2003 my hours were reduced from full time to part-time (30 hours or less), whereas my male co-workers are instructed to work at more than one store to ensure they receive a 40 hour work week each and every week, 8. My similarly situated male co-workers are paid at a higher rate than I am, in violation of Title VII and the Equal Pay Act.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.

1-29-04
Date        *Judy Enders*
Charging Party (Signature) | NOTARY - (When necessary to meet State and Local Requirements)

Subscribed and sworn to before me this date
(Day, month, and year) |

EEOC FORM 5    PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED    EM 0267

MAY 17 '04 16:47                2154402822        PAGE.10

A1

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF DELAWARE

 3   JUDY ENDERS/MADEN,          :
                                 :
 4        Plaintiff,             :
                                 :
 5        v.                     :   C.A. No. 05-669-JJF
                                 :
 6   SUPER FRESH,                :
                                 :
 7        Defendant.             :

 8                .. .. .. .. .. ..

 9            Deposition of JUDY ENDERS/MADEN, taken pursuant
     to notice, on Friday, January 19, 2007 at 9:30 a.m. in the
10   offices of Young, Conaway, Stargatt & Taylor, LLP, The
     Brandywine Building, 1000 West Street, 17th Floor,
11   Wilmington, Delaware, reported by Lorena J. Hartnett, a
     Registered Professional Reporter and Notary Public.
12
                  .. .. .. .. .. ..
13

14   APPEARANCES:

15        JOHN P. BARRY, ESQUIRE
          Proskauer Rose LLP
16        One Newark Center, 18th FLoor
          Newark, NJ  07102-5211
17          Admitted Pro Hac Vice
            Attorneys for Defendant
18

19

20

21

22              WILCOX & FETZER
          1330 King Street - Wilmington, DE  19801
23                (302) 655-0477
                  www.wilfet.com
24
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters



A2

1    Q    Sandy is her first name?

2    A    Yes.

3    Q    She worked at Super Fresh?

4    A    Yes.

5    Q    Okay.  Super Fresh is a grocery store?

6    A    Yes.

7    Q    And it's divided into different departments?

8    A    Yes.

9    Q    And what are the different departments that are in

10   Super Fresh?

11   A    Now, deli, bakery, meat department, seafood, and

12   grocery.

13   Q    And each department is led by a department

14   manager?

15   A    Yes.

16   Q    And the store is run by a store manager?

17   A    Yes.

18   Q    Do you know who the store manager reports to?

19   A    Not right now I don't.

20   Q    Back when you worked there, do you know who the

21   store manager would report to?

22   A    I can't think of his name right now.

23   Q    Do you know what the position was?

24   A    Who, the one over the store manager?



WILCOX & FETZER LTD.
Registered Professional Reporters

A3

1    Q    Yes.

2    A    No.

3    Q    What store did you originally start working in?

4    A    The one up by George's Bar and Boston Market.

5    Q    Okay.  And you immediately started working for

6    Rich Elliott?

7    A    Yes.

8    Q    And it's correct that the entire time that you

9    worked at Super Fresh you reported to Rich Elliott?

10   A    Yes.

11   Q    Did you interview with Rich Elliott when you came

12   in to apply for a job?

13   A    The store manager and then Rich Elliott.

14   Q    What were the hours of the store?

15   A    I am not really sure, because in the beginning I

16   was only part time, and I don't know if they are open 24

17   now.

18   Q    Okay, not now, just thinking back then.

19   A    I am not really sure.

20   Q    Okay.  Alright.

21   A    I just know my hours.

22   Q    Okay, so you started off part time?

23   A    Yes.

24   Q    And how many hours a week were you as a part-time

24

```
1   employee?

2        A    I am not sure if it was 28 to 32.

3        Q    Okay, and it was a union position.

4        A    Yes.

5        Q    So you had to pay dues?

6        A    Yes.

7        Q    And you were bound by a collective bargaining

8   agreement?  The union had a collective bargaining agreement

9   with Super Fresh?  Do you know?

10       A    I guess.  I am not really sure.

11       Q    Okay.  It's my understanding that another store

12  opened a store, 562?

13       A    Yes.

14       Q    Okay, and did basically the whole store move?

15       A    Yes.

16       Q    Okay, so it was just opening of a new store and

17  closing of an old one?

18       A    Yes.

19       Q    And did the old store also go by number 562?

20       A    I am not sure of that.

21       Q    But the new store did?

22       A    Yes.

23       Q    In the meat department you had the meat manager;

24  correct?
```



**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    A    Yes.

2    Q    And then below the meat manager there were meat

3  cutters and meat wrappers?

4    A    Yes.

5    Q    Were there any other positions in the meat

6  department?

7    A    No.

8    Q    Okay, what were the job duties of the meat

9  cutters?

10    A    To cut the meat and send it down the line.

11    Q    Okay, and what did meat wrappers do?

12    A    Wrap the meat and put it out in the case, date it,

13  put the lunch meat out.

14    Q    Okay, you would have to remove the old meat?

15    A    Yes.

16    Q    And the meat manager oversaw everybody in the meat

17  department?

18    A    (Nodding head)

19    Q    Yes?

20    A    Yes.

21    Q    Now, do you recall when you started working at

22  Super Fresh?

23    A    August '99, pretty sure.

24              (The reporter marked Enders 3.)

A6

1    Q    Ms. Enders, I am handing you a document.  We have

2 just had it marked as Enders 3.  It's a policy against

3 harassment in the workforce.  I am just handing this to you

4 to help you with the date when you started Super Fresh, if

5 you could turn to the last page.  Is that your signature?

6    A    Yeah, August '98.

7    Q    So does that sound right, it might have been 1998?

8    A    Yes.

9    Q    Do you recall when you switched from part time to

10 full time?

11    A    No, I don't.  It was at the new store.

12    MR. BARRY:  Can you mark this, please?

13    (The reporter marked Enders 4.)

14 BY MR. BARRY:

15    Q    Ms. Enders, I am handing you a document that we

16 have just had marked as an exhibit, Enders 4.  I don't know

17 if you have ever seen this type of document before, but it's

18 an internal A&P document to keep track of their employees

19 and their position changes.

20    A    Uh-huh.

21    Q    I have highlighted there the date of 4/16/2000

22 reflects the date that you began full-time employment.  Does

23 that sound about right when you became a full-time employee?

24    A    I am not sure.



1  Q  Evidence of what?

2  A  That he changed the schedules because I got

3 pregnant and got married.

4  Q  So but you have -- How often would the schedules

5 get thrown out in the trash?

6  A  Every time the schedules were old.

7  Q  Okay, so basically the next week the schedule

8 would get thrown out?

9  A  Yeah.

10  Q  So you started collecting the schedules back in

11 2002?

12  A  Yeah, 11/2002 when I went back.

13    MR. BARRY:  Why don't we mark these as

14  Enders 5 and 6.

15      (The reporter marked Enders 5

16      and 6.)

17 BY MR. BARRY:

18  Q  Ms. Enders, I am going to hand you two documents

19 that we have had marked as Enders 5 and Enders 6.  The first

20 Enders 5 indicates the date that you began taking a leave of

21 absence for the birth of your daughter.

22  A  Right.

23  Q  And the second indicates the date that you

24 returned from leave, and the date that you left indicates on

1    this form as being January 17, 2002, and your return-to-work

2    date as reflected on this document is September 30, 2002.

3    Just let me know if that sounds about accurate as to the

4    dates that you were out.

5        A    I would have to look them up.

6        Q    Okay, do you have any reason to believe that those

7    dates are not accurate?

8        A    No.

9        Q    So after you returned to work the end of

10   September 30 and thereafter, that's when you started

11   maintaining the documents on your schedule?

12       A    Yes.

13       Q    Alright, do you have any records pertaining to

14   your schedule before you went out on leave to have your baby

15   in January 2002?

16       A    If I don't, Super Fresh does.

17       Q    I thought you said they threw them out every week?

18       A    They do, but they have them upstairs in the file.

19   The meat department throws them away.  They got their own

20   schedules in each department.

21       Q    Okay, so there is the department schedule and then

22   there is an overall store schedule?

23       A    Yes, they have files of that.  No, I don't.

24       Q    Okay.  But is it your testimony that your schedule



1     A    Workman -- Not workman's comp.

2     Q    Alright, when the new store opened, what was its

3  hours of operation when it opened to the public?

4     A    I am not sure, because I always started at eight.

5     Q    Was the store open when you arrived at eight?

6     A    Yes.

7     Q    Did other meat wrappers report to work at seven?

8     A    Yes.  Not all the time.

9     Q    On some days?

10    A    (Nodding head)

11    Q    And who were the other meat wrappers that worked

12 there when you did?

13    A    Shirley Perryman, Josephine Kosinski, I think it

14 is.  Donna, I don't know her last name.  And there was two

15 more.  I can't think of their names.

16    Q    Were they both women?

17    A    Yes.

18    Q    During the entire timeframe that you worked at

19 Super Fresh, did any men work as meat wrappers?

20    A    Yeah, when they were supposed to be cutting,

21 they were out there wrapping meat.

22    Q    Okay, but their primary job would be to be a

23 cutter; is that right?

24    A    Yes.

1    Q    But then they would just help and wrap the meat at

2    times; is that what you are saying?

3    A    When somebody wasn't scheduled until later, I

4    would come in and they would be wrapping meat.

5    Q    Okay, so they would basically be covering; is that

6    fair to say?

7    A    If that's what you want to say.

8    Q    I don't want to say anything.  I am asking you if

9    it's an accurate thing to say.  If it's not, you can tell me

10   it's not.

11   A    It's not their job.

12   Q    Right, so their job was to be meat cutters?

13   A    Yes.

14   Q    Were there any other, during the entire time you

15   worked there, were there any men who were officially meat

16   wrappers, or were they all women?

17   A    They were all women.

18   Q    Before you had your baby you indicated that your

19   schedule was generally 8:00 to 4:30 and then on Saturdays

20   you would start working at 7:00 in the morning?

21   A    Yes.

22   Q    And then after you had your baby, how did your

23   schedule change?

24   A    Nine to 5:30, 11:30 to 8:00, sometimes two to

1   three nights a week.

2       Q   And did you have a problem with that schedule?

3       A   Yes.

4       Q   Okay, and what was the problem with the schedule?

5       A   Why did it have to change after I had a baby and

6   got married?

7       Q   Did any other --

8       A   I had to take my daughter to day care by a certain

9   time, because if I took her when I -- If I worked 11:30 to

10   8:00, if I took her later, I had the chance of her not being

11   there, her being out with the kids somewhere, and then I

12   would come home and it ain't -- I don't have no time with my

13   family.  Nobody else had to work 11:30 to 8:00 two to three

14   times a week.

15       Q   Were any other meat wrappers -- Well, withdrawn.

16   Were the other meat wrappers still coming in at 7:00 in the

17   morning?

18       A   Not all the time.  There was only me and another

19   meat wrapper at one time.

20       Q   Okay, and who was that?

21       A   Shirley Perryman.

22       Q   And would she basically work the hours that you

23   didn't want to work?

24       A   No.



W&F

WILCOX & FETZER LTD.

Registered Professional Reporters

A12

1    Q    What hours did she work?

2    A    They just scheduled her seven until they got mad

3    at her, and then they scheduled her at six.    And then when I

4    come in at eight, she come in later, so no meat wrapper was

5    always there at 7:00.

6    Q    But you had the priority in choosing the schedule?

7    A    I had seniority over her.    She started after me.

8    Q    So you had the preference, then, on the schedule?

9    A    I should have.

10    Q    Okay, did you?

11    A    Not really.

12    Q    You would have rather worked her schedule?

13    A    No, I didn't rather work her schedule.    I would

14    have rather worked the schedule I had in the beginning.

15    Q    And it's your position that your schedule was

16    changed because you got married and had a baby?

17    A    Yes, and because I gave them the day care's

18    schedule, and Shirley Perryman witnessed him hiding it and

19    throwing it away, and he said he didn't know whose it was,

20    and I was the only one that just had a baby in the meat

21    department.

22        Before that he picked my vacations and my

23    personals, and I guess that's when he started that, when he

24    got my day care schedule, he couldn't pick them no more.

1  considered that my lunch.  I didn't take lunch.

2      Q    Ever a situation where the child care provider

3  wasn't available at the last minute and you had to --

4      A    No.

5      Q    Okay.  How often would you make requests

6  concerning your schedule to Rich Elliott?

7      A    How many what?

8      Q    How often would you make a request concerning your

9  schedule to Rich Elliott?  Would you do it on a weekly

10 basis, just say this is what I want my schedule to be or --

11     A    No.

12     Q    So how often would you do it?

13     A    It was always the same, and then he switched it.

14 I couldn't do nothing about it.  The store manager wouldn't

15 do nothing about it, neither of them.  The only time I have

16 requested off is when my day care was closed.

17     Q    And you would make those requests in advance?

18     A    Yes, and would hide them, and Shirley Perryman can

19 witness that.

20     Q    You went to the store manager to complain about

21 this?

22     A    Yes, yes, I did.

23     Q    What was his name?

24     A    John Angeline and John Colantuono.



1    Q    And when did you go and complain to them about it,

2    back in 2002, as well?

3    A    Yes.

4    Q    Did you complain --

5    A    I guess.  I gotta look that up.  Yes, I complained

6    to them both.  They didn't do nothing about it.  The union

7    didn't do nothing about it.

8    Q    How often did you complain to the store manager,

9    how many times?

10    A    Once.

11    Q    Okay, and --

12    A    Because he didn't want to hear it no more.

13    Q    And how many times did you complain to the union?

14    A    Once.

15    Q    Who did you speak to at the union?

16    A    I don't know who he was, but he knew who Rich

17    Elliott was.

18    Q    So the union didn't help you?

19    A    Nope.  No.  I guess it was approximately around

20    11/16/02 when I went to the store manager.

21    Q    And what are you looking at?

22    A    My paperwork.

23    Q    Can I see which one you are looking at?

24    A    (Handing).



**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    say what you want to say, but you have to answer my

2    questions.  Do you know who Victoria McWilliams is?

3        A    Yes, I do.

4        Q    And she was an employee at Super Fresh; right?

5        A    Yes.

6        Q    She is someone who is also a meat wrapper; right?

7        A    Yes.

8        Q    She has more seniority than you; correct?

9        A    Yes.

10       Q    She had been on a disability leave of absence;

11   correct?

12       A    Yes.

13       Q    When she was ready to return to work, she couldn't

14   go back to her store because the person who held her same

15   position was now a shop steward; correct?

16       A    Yes.

17       Q    So under the collective bargaining agreement they

18   looked for the most junior person in that position who is

19   full time; correct?

20       A    Yes.

21       Q    And that was you; right?

22       A    Yes.

23       Q    And, therefore, when Vicky McWilliams was assigned

24   to your store, you were bumped from the position from full

1    time to part time; right?

2        A    Yes.

3        Q    Now, can you explain to me -- You were stating as

4    to how Rich Elliott was involved in that?

5        A    Yeah, because when Vicky was coming back, they

6    made the girl a shop steward so Vicky couldn't work there

7    full time.

8        Q    And who was it that --

9        A    Because they didn't want her in the store because

10   she already sued the company.

11       Q    Who was it that made the person a shop steward?

12       A    Probably Phil Johnson.

13       Q    Did Rich Elliott have anything to do with that?

14       A    Him and Phil communicate all the time.

15       Q    Okay, who is Phil Johnson?

16       A    The old store manager when I first started there.

17       Q    So you think Rich Elliott did this because he

18   wanted Vicky McWilliams to be working for him?

19       A    No, he wanted me to not be full time because he

20   had a problem with me.

21       Q    Did you ever --

22       A    They told me if I went over to Marsh Road and

23   covered for a week, then I would keep my full time.  If I

24   didn't, I would go back to part time.  I would go over there



A17

1    Q    How many times did it happen?

2    A    A lot.

3    Q    What does a lot mean?

4    A    I don't know how many times.

5    Q    Is this something that might have happened like

6   five or six times you are talking about?

7    A    Whenever he would get mad at me.

8    Q    How often did that happen?

9    A    Pretty much all the time.

10   Q    Right, I am trying to get an understanding as

11  to -- You are saying that he yelled at you in front of

12  employees and customers.  I want to know how many times that

13  happened.  If you can't remember, that's okay.

14   A    I don't remember, but it was a lot.

15   Q    Okay.  Do you have any specific -- Do you have a

16  specific recollection of it happening twice?

17   A    Yeah, I got two witnesses for it happening twice.

18   Q    Okay, do you remember those instances, or are you

19  relying on these other employees?

20   A    I remember them.

21   Q    Okay.  So you remember those two instances when it

22  happened?

23   A    Yes.

24   Q    Okay, what happened in those two instances?



1    A    The one was about the day care schedule, and

2  that's when Shirley was there.

3    Q    Okay.

4    A    And the other time was when he told me I was

5  working too slow or something like that and started yelling

6  at me, and I said something like, "We need another meat

7  wrapper, and then we can have off when we want it."

8        And he started yelling at me telling me, "If you

9  go back to part time, we can have another meat wrapper."

10  And Tracey Massareli told him, "You don't need to be talking

11  to her like that in front of customers.  If you have got a

12  problem with her, you take her in the back and you talk to

13  her in the back.  Don't be yelling at her on the floor."

14    Q    And how long did that exchange with Mr. Elliott

15  last?

16    A    Probably less than five minutes.

17    Q    Okay, and he --

18    A    And then he ran to the store manager.

19    Q    So he raised his voice and was yelling and saying

20  that if you returned to part time schedule then we can get

21  another person to come here and work?

22    A    Yeah.  Yes.

23    Q    On the day care schedule instance where he was

24  yelling, tell me exactly what you can remember.  What was

1    Q    No?

2    A    No.

3    Q    But all those policies might have been there, but

4    you just never noticed or looked for them?

5    A    Yes.

6    Q    Did you ever consider calling the anonymous

7    hotline?

8    A    No.

9    Q    Why not?

10   A    Because I didn't think of them things.

11   Q    Did you know there was an anonymous hotline?

12   A    No.

13   Q    Now, in your complaint that you filed in this

14   case, you make reference to your boss feeling your breasts

15   and your rear end.

16   A    Uh-huh.

17   Q    Is that something that Rich Elliott did?

18   A    Yes.

19   Q    And when did he do that to you?

20   A    In the old store and tried to in the beginning in

21   the new store until I got married and just tried to avoid

22   him.

23   Q    So it never happened again after you were married?

24   A    No.



WILCOX & FETZER LTD.
Registered Professional Reporters

A20

```
 1      A    I guess that's right.

 2      Q    Okay.  So the touching would have stopped at least

 3   before November 2001?

 4      A    No, not really.

 5      Q    No?

 6      A    Because every time we would go in the cooler, he

 7   would try to get touching and stuff, and I would pull away

 8   and leave.

 9      Q    Okay.  So you went out on leave in August of 2003;

10   right?

11      A    Yes.

12      Q    Your employment, though, wasn't officially

13   terminated for another 18 months until March 2005; is that

14   right?

15      A    Oh, my.  (Looking in folder).  3/05/2005, yes.

16      Q    Did you work at all during that timeframe?

17      A    No.

18      Q    Have you worked at all since?

19      A    No.

20      Q    Do you have any intent to try to find employment?

21      A    Yeah, when this is all over.

22      Q    What do you mean when this is all over, this

23   lawsuit?

24      A    Yeah.
```

A21

99

1           My initial question is did you type this or

2    prepare this?

3        A    Nuh-uh.

4        Q    How did that come about?

5        A    Department of Labor did.

6        Q    So you went down -- And, actually, we also had

7    marked as Exhibit 10 a copy of the harassment questionnaire.

8        A    Uh-huh.

9        Q    And this is what you filled out when you went down

10   to the Department of Labor?

11       A    Yes.

12       Q    Okay, and then someone at the Department of Labor

13   typed up what you told them to put into it; is that right?

14       A    Yes.

15       Q    Okay, now, take a look at Enders 9, which is the

16   charge, that one right there.  Could you please just read

17   that over for me?

18       A    What number?

19       Q    When I was saying Enders 9, that's just the

20   sticker.

21       A    Oh.

22       Q    But I want you to read the nature of your

23   allegations there.  And what I basically want, I am going to

24   ask you if everything that's in there is accurate.


A22

1    A    Yes.

2    Q    Okay, is everything on that document, is that

3    accurate?

4    A    Yes.

5    Q    Now, in the charge there isn't any reference to

6    Mr. Elliott touching you improperly.

7    A    Yeah, I know.

8    Q    Why is that?

9    A    Because I was more worried about the harassment I

10    was going through at the time.

11    Q    Okay.    Alright.    So that wasn't something that you

12    told to anybody?

13    A    No, I didn't tell the Department of Labor.

14    Q    Okay, and this other document that you filled out,

15    Enders 10, there is a request that you provide the

16    description of the harassment, Paragraph D.    Do you see

17    that?    For the record, referring to Bates Stamp P00175.

18    A    Yeah, what about it?

19    Q    Okay, and that's consistent with Enders 9 in that

20    it doesn't make any reference to this touching by

21    Mr. Elliott?

22    A    Uh-huh.

23    Q    Is that correct?

24    A    Yes.



## SUPER FRESH - LOCAL 56
## GEOGRAPHIC AREAS
### (as of January 13, 2002)

### AREA 1

230 Manoa
240 Wynnewood
241 Gladwyne
248 Devon
376 Coventry
377 Lionville

### AREA 2

239 Upper Dublin
243 Bristol
246 Upper Moreland
252 Richboro
723 Franklin Mills

### AREA 3

363 Walnutport
375 Doylestown
380 Lower Saucon

### AREA 4

710 Large & Bleigh
725 Mermaid Lane
726 Columbus Blvd.
730 5th & Pine
739 Ridge Avenue
747 10th & South

### AREA 5

244 Kennett Sq.
492 Pennsville
562 Claymont
565 Glasgow
584 Marsh Road
585 Chichester
586 New Castle
588 Newark

### AREA 6

404 Hightstown
420 Hamilton
485 Scotch Road
488 Plainsboro

### AREA 7

460 Mt. Holly
463 Evesham
468 Westmont

### AREA 8

471 Manahawkin
474 N. Wildwood
476 Cape May CH
477 Ocean City
490 Northfield
493 Hammonton

1. Chief Journeyman
2. Journeyman
3. Apprentice
4. Weigh Wrapper
5. SF Mgr
6. SF Clerk
7. Deli Head
8. Deli Clerk
9. Lead Bakery
10. Bakery Clerk
11. Chief
12. Meat Service Clerk

EM 0385

A24

Approved: 5-12-97
The Great Atlantic & Pacific Tea Company, Inc.

_Christian W. E. Haub_
Christian W. E. Haub
President & Co-CEO

# POLICY AGAINST
# HARASSMENT IN THE WORKPLACE

I. **PURPOSE**

The purpose of this policy is to maintain a wholesome environment for our employees, customers and vendors and to provide procedures for reporting, investigating and resolving complaints of harassment based on race, color, creed, religion, age, national origin, sex, sexual orientation, marital status, disability, veteran status, weight or height.

II. **POLICY**

It is the policy of A&P and its subsidiaries, (the "Company")  that all employees, customers and vendors have the right to work in or visit an environment free of such harassment.  The Company does not condone, and will not tolerate harassment.  Therefore, the Company shall take direct and immediate action to prevent such behavior and to remedy all reported instances of harassment.

III. **PROCEDURES**

A. Prohibited Activity

1. Harassment is here defined to encompass unwelcome conduct, explicit or implicit ridicule, mockery, belittlement or offensive or derogatory verbal or written remarks (includes graffiti or cartoons) that concern race, color, creed, religion, age, national origin, sex, sexual orientation, marital status, disability, veteran status, height or weight, either directly or indirectly to another person.  Such harassment is generally unlawful discrimination and is prohibited under federal and/or state employment laws.  For us it is also considered misconduct subject to disciplinary action.

2. More particularly, prohibited harassment is verbal or physical conduct that denigrates, shows hostility toward, or belittles or ridicules any individual or group that is unrelated to job function or performance <u>and</u> that:

   c) Has the purpose or effect of creating an intimidating, hostile or offensive work environment;

   d) Has the purpose or effect of unreasonably interfering with an individual's work performance; or

   e) Otherwise adversely affects an individual's employment opportunities.

3. Any use of e-mail or other media that may have the purpose or effect of harassing or ridiculing any individual or any group in the workplace also falls under the parameters of the policy.

Page 1 of 2

EM 0062

A25

**B.    Supervisor Responsibilities**

1.    Each supervisor shall be responsible for preventing and eliminating harassment.  This responsibility includes:

   a.    Monitoring the environment for signs that harassment may be occurring; and,

   b.    Reporting to the facility manager or the Personnel Department any acts of harassment, as defined above.  This includes slurs, derogatory comments or conduct.

2.    Failure to assume and perform this responsibility shall be grounds for disciplinary action.

**C.    Employee Responsibilities**

1.    Each employee is responsible for assisting in the prevention and elimination of harassment as defined above, through the following acts:

   a.    Refraining from participation in or encouragement of, actions that could be perceived as harassment; and,

   b.    Reporting observed acts of harassment to your facility manager or directly to the Personnel Department.

2.    Failure to comply with the foregoing shall be grounds for disciplinary action.

**D. –    Complaint Procedure**

1.    An Employee experiencing harassment, including derogatory comments and slurs based on race, color, creed, religion, age, national origin, sex, sexual orientation, marital status, disability (handicap), veteran status, height or weight, where circumstances permit, should tell the person that his/her actions are unwelcome and offensive and should be stopped.

2.    Such an employee [who believes that he/she is being harassed] must report the matter to his/her Personnel Department as soon as possible so that steps may be taken to end the problem.

3.    Each reported incident will be appropriately investigated, as confidentially as the situation warrants and permits, and a conclusion or resolution reached.

4.    If the resolution is unsatisfactory to the employee, the employee may appeal the decision, in writing, to the Corporate Human Resource Department at 2 Paragon Drive, Montvale, New Jersey 07645.

**E)    Retaliation**

1.    Any retaliation against an individual who has complained about harassment, or retaliation against individuals for cooperation with an investigation of harassment is prohibited and will not be tolerated.

2.    Any employee experiencing retaliation should use and follow the Complaint Procedure in Section D.

Page 2 of 2

EM 0063

A26

## POLICY PROHIBITING SEXUAL HARASSMENT

Harassment in the workplace on the basis of sex violates both Company policy and the law; the Company will not tolerate such misconduct. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature are not allowed and constitute sexual harassment when:

1. Submission to such conduct is made either explicitly or implicitly a term or condition of employment;

2. Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual;

**OR**

3. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

If you believe that you are being sexually harassed, you must report the matter immediately to James Varian, Director of Human Resources, telephone (609) 499-6015, or by mail to P.O. Box 68, 700 Railroad Avenue, Florence, NJ 08518. Your information will be accepted in confidence and the necessary investigation will be undertaken. No Retaliation will be tolerated.

Management fully intends to enforce this policy strictly and will take appropriate action to prevent, stop and remedy any such improper conduct. If you have any problems with the enforcement of this policy you should notify the Vice President of Human Resources, 2 Paragon Drive, Montvale, NJ 07645.

**VIOLATION OF THIS POLICY WILL NOT BE TOLERATED AND WILL RESULT IN DISCIPLINE UP TO AND INCLUDING DISCHARGE.**

I have read and understood the "Policy Prohibiting Sexual Harassment".

_Judy Enders_
Name (Please Print)

_Judy Enders_
Signature

8/3/98
Date

PHILADELPHIA DIV. SUPER
6/97 FRESH
25-581
3609 PHILADELPHIA PIKE
Restated and reissued 03/98

EM 0060

A27

Policy #7
Revised and Reissued: July 6, 2004
Functional Owner: Vice President, Chief Internal Auditor

## INTERNAL COMPLAINT POLICY

It is the policy of The Great Atlantic & Pacific Tea Company, Inc. ("A & P") and its family of companies (collectively "the Company") to provide all employees with a method to report and resolve complaints and concerns. Consequently complaint procedures are specifically mentioned in such policies as the anti-discrimination Equal Employment Opportunity Policy, the Americans With Disabilities Policy and the Policies Against Harassment and Sexual Harassment, as well as the Time Payment Policy and Code of Conduct. Additionally and explicitly to comply with the Sarbanes-Oxley Act, the Audit Committee of the Board of Directors has established specific procedures to handle complaints regarding Company accounting, internal accounting controls or auditing matters.

**The complaint procedure contained herein is universally applicable and notably is available in cases of perceived retaliation or violation of law or policy.**

## Procedure

Any employee with a complaint about discrimination, failure to accommodate, a violation of law or policy, retaliation, or other work-related complaint should contact the local Human Resources ("HR") Leader. The current listing (with the name, address and phone number) is attached. If an employee is uncomfortable complaining to his/her local HR Leader, the employee may complain to the Director, Associate Relations & Organizational Development at 2 Paragon Drive, Montvale, NJ 07645, (201) 571-8337. The employee may also pursue the complaint through the **NETWORK HOT LINE at 1-888-277-3258**.

Complaints concerning fraud or Company accounting, internal accounting controls or auditing matters must be made directly to the Office of the General Counsel (201) 571-4401 or the Chief Internal Auditor (201) 571-4148, at 2 Paragon Drive, Montvale, NJ 07645 **or** the NETWORK HOT LINE above.

Complaints may be made anonymously. However if the employee has an affirmative duty to report an irregularity or legally suspect conduct, the anonymous report may not be sufficient to satisfy that obligation and the person remains subject to disciplinary action up to and including discharge. This level of accountability most notably occurs at the management level.

All complaints (anonymous, verbal and written) must be made with sufficient information and detail to permit an appropriate investigation.

The complaint may be verbal or written. The Company will arrange to secure a full report from the employee and promptly conduct any necessary investigation which will be kept as confidential as the situation warrants and permits. An employee with a complaint about another employee's conduct, and where circumstances reasonably permit, first may want to tell the person that his/her actions are unwelcome and offensive and should be stopped.

The conclusion and resolution of the complaint will be communicated and any necessary action undertaken. Upon written request by the complainant a written response will be provided after review by the Law Department. If the complaint concerns another employee, barring extenuating circumstances, that individual may request and similarly receive a statement as to the conclusion of the investigation.

If the resolution is unsatisfactory and the employee wants to appeal the decision, the employee must submit a written request with reasons for the appeal to the Director, Associate Relations & Organizational Development (see address above). If the complaint was originally filed with the Director, Associate Relations & Organizational Development the employee may appeal to the Office of the General Counsel at 2 Paragon Drive, Montvale, NJ 07645.

Because of the serious nature of making a formal complaint, employees who knowingly allege a false claim may be subject to discipline, up to and including discharge.

**No retaliation will be tolerated.** This means that an employee will not suffer adverse employment consequences for making a complaint in good faith or taking part in the investigation. Any employee experiencing retaliation should use and follow the complaint procedure.

Page 1 of 1

**EM 0379**

A28

HR Contact List to Company Policies                                    Current as of July 6, 2004

## A&P HUMAN RESOURCES

| CORPORATE | | |
| --- | --- | --- |
| **VP HR, A&P** | **VP HR, Corporate Staff** | **Director of Associate Relations & Org Dev** |
| Don Montana | Paul Marsico | Sheila McCloskey |
| 2 Paragon Drive | 2 Paragon Drive | 2 Paragon Drive |
| Montvale, NJ 07645 | Montvale, NJ 07645 | Montvale, NJ 07645 |
| (201) 571-4327 | (201) 571-4177 | (201) 571-8337 |

| A&P U.S. FUNCTIONAL AREAS | | |
| --- | --- | --- |
| **SVP HR& Labor Relations A&P U.S.** | **Director HR** | **Director HR** |
| Allan Richards | Nick Iadevaio | Mike Simon |
| 90 Delaware Avenue | 90 Delaware Avenue | 90 Delaware Avenue |
| Paterson, NJ 07503 | Paterson, NJ 07503 | Paterson, NJ 07503 |
| (973) 321-3843 | (973) 321-3772 | (973) 321-3710 |
| | | |
| **Director HR** | | |
| Valerie Burns | | |
| 90 Delaware Avenue | | |
| Paterson, NJ 07503 | | |
| (973) 321-3586 | | |

| A&P BANNER | | |
| --- | --- | --- |
| **Director HR/Training** | **HR Manager** | **HR Manager** |
| Jen Thoma | Bob Greiner | Vickie Maul |
| 216 Old Tappan Road | 216 Old Tappan Road | 216 Old Tappan Road |
| Old Tappan, NJ 07675 | Old Tappan, NJ 07675 | Old Tappan, NJ 07675 |
| (201) 571-4671 | (201) 571-4617 | (201) 571-4654 |
| | | |
| **Liquor Stores** | **HR Manager** | |
| Nick Iadevaio | Holly Janisieski | |
| 90 Delaware Avenue | 820 Washington Street | |
| Paterson, NJ 07503 | Middletown, CT 06457 | |
| (973) 321-3772 | (860) 754-1410 | |

EM 0380

A29

| THE FOOD EMPORIUM BANNER | |
|---|---|
| **Director HR** | **HR Manager** |
| Maureen McLaughlin | Howie Stone |
| 20 Livingston Avenue | 20 Livingston Avenue |
| Dobbs Ferry, NY 10522 | Dobbs Ferry, NY 10522 |
| (914) 826-2331 | (914) 826-2332 |

| FOOD BASICS BANNER |
|---|
| **Director HR** |
| Pam Biles |
| 90 Delaware Avenue |
| Paterson, NJ 07503 |
| (973) 321-3805 |

| FARMER JACK BANNER | |
|---|---|
| **VP HR** | **Director HR Administration** |
| Marion King | Donna Tikkanen-Davis |
| 18718 Borman Avenue | 18718 Borman Avenue |
| Detroit, MI 48228 | Detroit, MI 48228 |
| (313) 270-1354 | (313) 270-1299 |

| SUPER FRESH BANNER | |
|---|---|
| **VP HR/Labor Relations** | **Director HR** |
| Tim Camp | Derek Kinney |
| 1506 Woodlawn Drive | 1506 Woodlawn Drive |
| Baltimore, MD 21207 | Baltimore, MD 21207 |
| (410) 594-7526 | (410) 594-7616 |

| SAV-A-CENTER BANNER |
|---|
| **Director HR** |
| Sam Lee |
| 1401 Jefferson Highway |
| Jefferson, LA 70121 |
| (504) 846-6018 |

| WALDBAUM'S BANNER | | |
|---|---|---|
| **Director HR** | **HR Manager** | **HR Manager** |
| Christine McMahon | Jim McNally | Maura McLoughlin |
| 133-11 20th Avenue | 133-11 20th Avenue | 133-11 20th Avenue |
| College Point, NY 11356 | College Point, NY 11356 | College Point, NY 11356 |
| (718) 559-0841 | (718) 559-0905 | (718) 559-0822 |

EM 0381

A30

## SUPPLY & LOGISTICS

**VP HR & Labor Relations**
Rich Pires
90 Delaware Avenue
Paterson, NJ 07503
(973) 321-3764

**Dunmore**
Al Barone
Keystone Industrial Park
P.O. Box 180
Dunmore, PA 18512
(570) 961-1834

**Director HR**
Kurt Simmons
2 Paragon Drive
Montvale, NJ 07645
(201) 571-8807

**Atlantic Region Warehouses**
Art Elkin
35 Brunswick Avenue
Edison, NJ 08817
(732) 777-6195

**Burt Road (Detroit)**
Bill Ziegler
12364 Burt Road
Detroit, MI 48228
(313) 270-1466

EM 0382

A31



**AGREEMENT**

UNITED FOOD & COMMERCIAL WORKERS UNION, LOCAL 56

*Local* **56**
AFL-CIO

SUPER FRESH FOOD MARKETS, INC.

Term: November 2, 2003 through November 1, 2008

PR ENDERS-MADEN 0013

20.5    If a physical examination or health permit is required by the Employer or Local Government, the cost of the examination or permit shall be borne by the Employer.

20.6    No associate shall be required to take a polygraph test (lie detector) or any other similar examination.

20.7    Associates who sustain an occupational injury requiring treatment by a doctor shall suffer no loss in pay for the day the injury occurs.

20.8    Counseling records shall be valid for a period of eighteen (18) months.

## ARTICLE 21
### PROBATIONARY AND TRIAL PERIOD

21.1    a.    The first ninety (90) days of employment of a new associate should be considered a probationary period.

         b.    During the probationary period the Employer may discharge any associate for any reason whatsoever without the Union having any recourse to the grievance and arbitration procedure. Except for wages and hours which are applicable during the probationary period, no other benefits set forth in this Agreement shall become effective before the ninety-first (91st) day of employment, except as otherwise provided herein.

## ARTICLE 22
### UNION STEWARDS, COMMITTEE PERSONS, ENFORCEMENT OF STANDARDS, UNION STORE CARDS

22.1    The Union will use its best efforts to secure as Committee persons and/or Stewards a high caliber of associate, who shall be required to conform to the standards and qualifications required by the Union and the Employer. Committee persons and/or Stewards shall be the last to be laid off within their full-time or part-time classification, if reasonably able to perform the work.

22.2    The Union shall furnish the Employer with the name of the Committee person and/or Steward, which list shall be supplemented from time to time as necessary.

22.3    The Union shall do everything within its power to enforce the rules and regulations of the Employer and through advice, instruction and example to maintain the highest standard of work.

22.4    The Union shall furnish to the Employer at least one (1) official Union emblem for each of the Employer's stores covered by this Agreement, to be displayed in the customer area of the premises. Such official emblems shall remain the property of and shall be surrendered to the Union on demand.

22.5    The Committee persons and/or Stewards, or other individual associates covered hereby, shall not be considered agents of the Union for the purpose of calling strikes or slowdowns.

13

PR ENDERS-MADEN 0022

A33

22.6    Full-time Committee persons and/or Stewards shall be entitled to thirty-two (32) hours of leave and part-time Committee persons and/or Stewards to sixteen (16) hours of leave in each calendar year with pay for training and education. The Union must notify the Employer at least two (2) weeks in advance thereof. The associate must, upon returning from the leave, present the Store Director with written evidence from the Union that he has used the leave for the purpose for which the leave was intended.

22.7    In addition to the other benefits for Committee persons and/or Stewards; e.g. thirty-two (32) hours' yearly paid training for full-time and sixteen (16) hours for part-time, they shall have super seniority for layoffs, vacation schedules and shifts, provided in the latter instance it shall be applied only where mutually agreeable to the Employer, based upon the qualifications and availability of such Committee person and/or Steward.

22.8    The Shop Steward shall be the last in the classification to be transferred from their store.

## ARTICLE 23
### HIRING

23.1    In all hiring, the Employer will staff its stores within the limits of the service and financial considerations required to maintain as profitable business as was mutually agreed upon in the Agreement of Principal.

23.2    To this end, the Employer and Union have agreed to establish a committee to evaluate the Employer's requirements and to recommend personnel to the Employer as outlined in the committee's operating procedures.

23.3    The Company agrees to post all full time job openings company wide to provide associates an opportunity to apply for such openings. The Union and the Company agree to reestablish the hiring committee for the purpose of resolving questions regarding full time job openings and selection based on factors including fitness, qualification, availability and seniority. All other factors being equal, seniority should prevail.

23.4    All associates hired after ratification of this Agreement shall be given credit for previous similar supermarket retail food store experience acquired within four (4) years of the time in which application for employment is made, provided that this experience is declared at the time of application for employment. However, the basic rate of pay as determined by the application of this clause shall not exceed the maximum rate of pay which was paid in acquiring the previous experience.

23.5    ORIENTATION LEAVE

On or about the ninetieth (90th) day of employment, any new associate shall receive leave with pay of two (2) hours at straight-time for the purpose of receiving a combined Company and Union orientation.

The mechanics of "Where" and "How" shall be resolved between the Parties.

## ARTICLE 24
### HEALTH PLAN

The employer agrees to participate in and make contributions on behalf of eligible associates to the appropriate Health Plan described in Appendix "C".

14

**APPENDIX "A"**
**MEAT GROUP PROMOTIONS AND LAYOFFS**

**LAYOFFS**

A.  In the case of layoff, due to lack of work, the Employer shall recognize seniority within each job classification listed hereafter:

| GROUP III | GROUP II | GROUP I |
|---|---|---|
| Chief Journeyman | Chief Deli | Weigher/Wrapper |
| Journeyman | Seafood Manager | Seafood Clerks |
|  | Bakery Chief | All others |
|  | Apprentice Journeyman |  |

B.  The least senior full-time associate in the specific classification will be the first to be laid off. Such associate may elect to reduction to part-time status within the specific classification, or another classification, providing there is a less senior associate working.

C.  The least senior part-time associate in the specific classification will be first to be laid off. Such associate may elect to continue work in another part-time classification, if qualified to perform the work and that there is a less senior associate working.

D.  In the event that a Chief Journeyman, Chief Deli/Bakery, Seafood Department Head, or Lead Baker should be laid off or request voluntary demotion, such associate may replace a full-time or part-time associate in another classification, providing he is qualified to perform the work and that there is a less senior associate working.

E.  A Journeyman, if laid off, may elect to replace an Apprentice, Deli/Bakery Service Clerk, Weigher/Wrapper, or Seafood Clerk, if a less senior associate is working.

F.  The Employer shall give one (1) week's notice to both the Union and the effected full-time associate of an intended layoff. In the case of a part-time associate, the Employer shall give one (1) day's notice to the associate only.

G.  In the case of layoffs caused by strikes, acts of God, power failure or other reasons beyond the control of the Employer, advance notice of layoff need not be given.

H.  Associates replacing another associate in a lesser rated job will be paid the rate of the associate displaced.

I.  Layoff – Associates with Two (2) or More Years of Service

In the event of layoffs or reductions in classifications and/or store closings, full time and part time associates with two (2) or more years of service may exercise his/her seniority to replace the least senior associate in the same classification within his/her area. If unable to displace the least senior associate in the same classification, within the geographic area, he/she may displace the least senior associate in the bargaining unit in his/her classification, provided the associate is capable of performing the job available.

1.  All transfers provided for herein shall be within the employee's job classification.

2.  In effecting permanent transfers between stores, the Employer shall consider seniority in conjunction with ability and practicability, other criteria, the availability of transportation and the travel required. The Employer will, where possible, arrange transfers within geographic locality.

17

PR ENDERS-MADEN 0024

A35

3.  If the transfers cannot be effected with the employee's geographic locality, then the transfer will be made to the specified adjourning locality in which event the least senior employee will be transferred.

4.  When it is any other than the least senior employee to be transferred out of the geographic locality, the Hiring committee will discuss the problem.

### PROMOTIONS

A.  In promotions within a specific classification or between classifications, the Employer shall consider seniority in conjunction with qualifications, skill, ability, and practicability. Where all of the above, except seniority, are relatively equal, seniority shall govern.

B.  There will be a ninety (90) day trial period for all employees promoted to Chief Journeyman, Chief Deli/Bakery, Lead Baker, Seafood Department Head, Apprentice and higher classifications. Should the associate be disqualified, either voluntarily or involuntarily, they shall return to their former store, classification and status.

18

A36

**APPENDIX "B"**
**GROUP CLASSIFICATIONS AND WAGES**

A.  The following across-the-board increases shall apply to all employees who have reached the top of scale and are on the payroll as of November 1, 2003.

**Across the Board Hourly Wage Increases**

|  | 11/1/03 | 11/1/04 | 11/1/05 | 11/1/06 | 11/1/07 |
|---|---|---|---|---|---|
| Managers | $.60 | $.60 | $.60 | $.60 | $.60 |
| Full/Part-time Employees | $.50 | $.50 | $.50 | $.50 | $.50 |

B.  Experienced Rate

When a person is hired at an "experienced" rate they shall, at the time of their next progression, continue in their progression schedule at the appropriate time. Any store which increases its hiring rate, all associates making less than the new hire rate shall be moved to the new rate and retain their progression date.

C.

| Classification | EFFECTIVE 11/1/03 | EFFECTIVE 11/01/04 | EFFECTIVE 11/01/05 | EFFECTIVE 11/01/06 | EFFECTIVE 11/01/07 |
|---|---|---|---|---|---|
| Chief Journeyman | 21.25 | 21.85 | 22.45 | 23.05 | 23.65 |
| Journeyman | 19.90 | 20.40 | 20.90 | 21.40 | 21.90 |
| Apprentice | | | | | |
| 1st 6 months 65% | 13.11 | 13.61 | 14.11 | 14.61 | 15.11 |
| 2nd 6 months 70% | 14.08 | 14.58 | 15.08 | 15.58 | 16.08 |
| 3rd 6 months 80% | 16.02 | 16.52 | 17.02 | 17.52 | 18.02 |
| 4th 6 months 85% | 16.99 | 17.49 | 17.99 | 18.49 | 18.99 |
| Chief Deli | 18.90 | 19.50 | 20.10 | 20.70 | 21.30 |
| Bakery Chief | 18.90 | 19.50 | 20.10 | 20.70 | 21.30 |
| Lead Baker | 15.15 | 15.65 | 16.15 | 16.65 | 17.15 |
| (Where designated and combo Dept.-hired after 12/4/94) | | | | | |
| Seafood Dept. Head | 18.70 | 19.30 | 19.90 | 20.50 | 21.10 |

19

PR ENDERS-MADEN 0025

A37

APPENDIX "B"- GROUP CLASSIFICATIONS AND WAGES (Continued)

| | | | | | |
|---|---|---|---|---|---|
| Self-Service Seafood Head | 14.45 | 15.05 | 15.65 | 16.25 | 16.85 |
| Certified Chefs | 14.10 | 14.60 | 15.10 | 15.60 | 16.10 |

| D. CLASSIFICATION | EFFECTIVE 11/1/03 | EFFECTIVE 11/01/04 | EFFECTIVE 11/01/05 | EFFECTIVE 11/01/06 | EFFECTIVE 11/01/07 |
|---|---|---|---|---|---|
| Former A&P Weighers/Wrappers | 16.30 | 16.80 | 17.30 | 17.80 | 18.30 |
| Former A&P Clerks | 15.50 | 16.00 | 16.50 | 17.00 | 17.50 |
| Weighers/Wrappers and all Clerks hired before 10/22/88 | 14.10 | 14.60 | 15.10 | 15.60 | 16.10 |
| Weighers/Wrappers and all Clerks hired before 07/21/85 | 15.10 | 15.60 | 16.10 | 16.60 | 17.10 |

Weighers/Wrappers, through progression prior to 12/20/98, Deli/Bakery/Service Clerks hired prior to 10/27/91, Seafood Service Clerks hired prior to 12/04/94.

| | | | | | |
|---|---|---|---|---|---|
| Deli/Bakery/Service | 13.75 | 14.25 | 14.75 | 15.25 | 15.75 |
| Clerks hired before 12/4/94. | 12.55 | 13.05 | 13.55 | 14.05 | 14.55 |
| Weighers/Wrappers FT/PT | 12.55 | 13.05 | 13.55 | 14.05 | 14.55 |

E.    All Full Time Deli/Bakery/Service/Seafood Clerks and Weighers/Wrappers who have not reached top of scale as of 11/01/03 or who are hired on or after11/01/03.

| | EFFECTIVE 11/1/03 | EFFECTIVE 11/01/04 | EFFECTIVE 11/01/05 | EFFECTIVE 11/01/06 | EFFECTIVE 11/01/07 |
|---|---|---|---|---|---|
| Start | $6.00 | 6.15 | 6.30 | 6.45 | 6.45 |
| After 30 days | $6.10 | 6.25 | 6.40 | 6.50 | 6.50 |
| After 6 months | $6.30 | 6.45 | 6.55 | 6.60 | 6.60 |
| After 12 months | $6.60 | 6.75 | 6.85 | 6.90 | 6.90 |
| After 18 months | $7.00 | 7.15 | 7.25 | 7.25 | 7.25 |
| After 24 months | $7.40 | 7.50 | 7.55 | 7.55 | 7.55 |
| After 30 months | $7.80 | 7.95 | 8.00 | 8.00 | 8.00 |
| After 36 months | $8.20 | 8.35 | 8.35 | 8.35 | 8.45 |
| After 42 months | $8.60 | 8.75 | 8.75 | 8.75 | 8.85 |
| After 48 months | $9.10 | 9.25 | 9.25 | 9.25 | 9.45 |
| After 54 months | $9.45 | -- | 9.60 | 9.60 | 9.85 |
| After 60 months | $9.95 | -- | -- | 10.00 | 10.45 |

ACB - $.50  11/03

anyone over $9.95 gets $.50 increase                          20

A38

APPENDIX "B" – GROUP CLASSIFICATIONS AND WAGES (Continued)

F.    All Part Time Deli/Bakery/Service/ Seafood Clerks and Weighers/Wrappers who have not reached top of scale as of 11/01/03 or who are hired on or after 11/01/03.

| | EFFECTIVE 11/1/03 | EFFECTIVE 11/01/04 | EFFECTIVE 11/01/05 | EFFECTIVE 11/01/06 | EFFECTIVE 11/01/07 |
|---|---|---|---|---|---|
| Start | $6.00 | 6.05 | 6.10 | 6.15 | 6.15 |
| After 6 months | $6.15 | 6.20 | 6.25 | 6.30 | 6.30 |
| After 12 months | $6.30 | 6.35 | 6.40 | 6.45 | 6.45 |
| After 18 months | $6.45 | 6.55 | 6.60 | 6.60 | 6.60 |
| After 24 months | $6.60 | 6.65 | 6.70 | 6.70 | 6.70 |
| After 36 months | $6.75 | 6.80 | 6.85 | 6.90 | 6.90 |
| After 42 months | $6.90 | 6.95 | 7.00 | 7.05 | 7.05 |
| After 48 months | $7.05 | 7.10 | 7.15 | 7.20 | 7.20 |
| After 54 months | $7.20 | 7.25 | 7.25 | 7.30 | 7.35 |
| After 60 months | $7.35 | -- | -- | 7.60 | 7.65 |

APPRENTICE JOURNEYMEN

A.    Apprentice Journeymen shall at all times be full-time associates.

B.    The Apprenticeship Program shall be two (2) years.  A Joint Employer Union Evaluation Committee shall be established to examine Apprentices graduating to Journeymen.

C.    Apprentice Journeymen are associates whose duty shall be to cut meat at least twenty-five percent (25%) of the time, and among other duties in servicing Meat Departments, to wait on customers.

D.    The number of Apprentice Journeymen in any store may be established at the discretion of the Employer, however, it shall not exceed the following store ratio:

One (1) Apprentice Journeyman for each Journeyman.

One (1) Apprentice Journeyman for the first three (3) Meat Cutters and/or Journeymen.

One (1) Apprentice Journeyman for an additional two (2) Meat Cutters and or Journeymen.

E.    An apprentice Journeyman shall be examined not later than the twenty-third (23rd) month of his Apprenticeship.  If he qualifies, he will be graduated to Journeyman.  If he fails, he shall remain in the Apprentice classification for an additional six (6) months.  During the twenty-ninth (29) month, he shall be examined again.   If he fails once more, the committee shall determine the final classification of the affected person.

21

PR ENDERS-MADEN 0026

A39

LEXSEE



Positive
As of: Feb 15, 2007

**CATHERINE L. CALLOWAY, Plaintiff, v. E.I. DUPONT DE NEMOURS AND COMPANY, a Delaware corporation, Defendant.**

**C.A. No. 98-669-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2000 U.S. Dist. LEXIS 12642**

**August 8, 2000, Decided**

**NOTICE:** [*1]   FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendant's motion for summary judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed an action against defendant employer, asserting a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., for hostile work environment and retaliation. Defendant filed a motion for summary judgment.

**OVERVIEW:** Defendant employer requested summary judgment on plaintiff's claims of violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., for hostile work environment and retaliation. The court found plaintiff failed to demonstrate that gender was a substantial factor in the discrimination. Plaintiff did not get along with co-workers or supervision and was the target of unwelcome attention. But no evidence indicated that the facially gender-neutral conduct was based on gender. Unprofessional and spiteful behavior by co-workers did not suffice. None of the conduct concerned overtly offensive, sexually oriented behavior. The conduct was also not sufficiently "pervasive and regular" to constitute a hostile work environment. The evidence demonstrated plaintiff was put on probation because she falsified records and she was terminated because she was not released to return to work after her disability leave. She failed to demonstrate directly or circumstantially any weaknesses, implausibilities, inconsistencies, incoher-

ences, or contradictions in defendant's reasons for probation and termination. Summary judgment entered for defendant.

**OUTCOME:** Defendant's motion for summary judgment was granted. None of the conduct concerned overtly offensive, sexually oriented behavior. The conduct was also not sufficiently "pervasive and regular" to constitute a hostile work environment. Plaintiff was put on probation because she falsified records and she was terminated because she was not released to return to work after her disability leave.

**CORE TERMS:** harassment, co-worker, retaliation, supervisor, pervasive, sexual, hostile, sex, disability, spinning machine, probation, hostile work environment, summary judgment, payroll, sexual harassment, offensive, abusive, regular, work environment, retaliatory, assigned, female, intimidation, terminated, factfinder, subjected, workplace, severe, animus, supervision

**COUNSEL:** Catherine L. Calloway, Pro se.

For defendant: Kathleen Furey McDonough, Esquire, William J. Dorgan, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, Chief Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

    **MEMORANDUM OPINION**

2000 U.S. Dist. LEXIS 12642, *

**Dated: August 8, 2000**
**Wilmington, Delaware**

**ROBINSON, Chief Judge**

## I. INTRODUCTION

Plaintiff, Catherine L. Calloway, filed this action on December 2, 1998 against defendant E.I. DuPont de Nemours and Company ("DuPont"), asserting a claim under the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., for hostile work environment and retaliation. (D.I. 1) Plaintiff alleges that her co-workers' and supervisors' actions were willful and intentional, were based on discriminatory animus, and resulted in emotional and psychological stress that disabled her from work. (D.I. 1) Plaintiff further alleges that she was subject to retaliation because of her complaints to supervisors about harassment. (D.I. 1) Plaintiff began her employment with Du-Pont on March 26, 1990 and, on November 18, 1993, was [*2] assigned to the Textile Department in DuPont's nylon plant in Seaford, Delaware, where she became a qualified spinning machine operator ("SMO"). n1 (D.I. 99 at A19) Her employment with DuPont was terminated on July 31, 1997, when her health care provider refused to release her to return to work after six months of disability leave. (D.I. 90 at A10) The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

> n1 The spinning machines at the Seaford Nylon Plant turn nylon thread into nylon yarn. Each spinning machine has a variety of positions, and the SMOs are assigned a series of positions along a particular spinning machine. (D.I. 90 at A151-52) The SMOs are responsible for the operation of their assigned spinning machine. Their job duties include performing routine preventive maintenance work, performing quality checks, packing the completed yarn, and keeping required records of break delay time. (D.I. 90 at A89-92, A145)

Currently before the court is defendant's motion [*3] for summary judgment. (D.I. 88) For the reasons that follow, the court shall grant defendant's motion.

## II. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of ma-

terial fact exists. See Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a [*4] genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most [*5] favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)).

## III. DISCUSSION

### A. Plaintiff's Allegations of Harassment and Retaliation

On December 29, 1997, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against her former employer, defendant. In her complaint, plaintiff asserted the following:

> I. After complaining of sexual harassment in November of 1996, I was continuously harassed by supervision up until my discharge. On July 31, 1997, I was discharged from E.I. DuPont.

II. I was informed by the personnel office that I was discharged because my six months of disability had run out.

III. I believe I have been discriminated against based upon my race (white), sex (female), age (44), disability, and retaliated against, because:

1. I was verbally harassed by my supervisors after making a sexual harassment complaint against [*6] a co-worker in 1996.

2. In January of 1997, I was taken out of work by my physician and placed on disability for one year. On July 31, 1997, I was discharged. I believe my disability time was cut short due to my sex (female), race (white), age (44), the type of disability I have, and because I placed a sexual harassment complaint against a co-worker.

(D.I. 90 at A149) She further asserted that the alleged discrimination took place, at the "earliest," in November 1996 and, at the "latest," on July 31, 1997. (D.I. 90 at A149)

Taking her EEOC complaint as the framework for this litigation, n2 the record assembled for these summary judgment proceedings, taken in a light most favorable to plaintiff, demonstrates that the following incidents took place during the time period November 1, 1996 through July 31, 1997: n3

. On a number of occasions, individuals, both male and female, used plaintiff's payroll number without apparent authorization when making entries into the Textile Spinning Information System ("TSIS") n4 and when operating plaintiff's assigned spinning machine. (D.I. 99 at A104-08)

. Plaintiff's supervisor reprimanded her on a number of occasions for "writing [*7] notes" in the spinning machine aisles despite the fact that she had been instructed to do so by another supervisor. (D.I. 90 at A21, A39-40; D.I. 99 at A162)

. Plaintiff's supervisors were unresponsive to her complaints of harassment and misuse of her payroll number. n5 (D.I. 90 at A11, A22, A43)

. A co-worker, whose employment with DuPont was terminated as a result of his actions, used plaintiff's payroll number to enter an offensive comment n6 into TSIS. n7 (D.I. 99 at A43, A49, A92)

. On approximately six (6) different occasions, derogatory remarks (calling out her name followed by either "boo hoo" or "cry baby") directed at plaintiff were announced over the intercom system. (D.I. 90 at A53-56)

. On December 14, 1996, plaintiff and her husband were placed on probation for falsification of records. (D.I. 90 at A13; D.I. 99 at A122, A124, A126, A129)

. On or about December 18, 1996, a female co-worker hit plaintiff's back with her fist. (D.I. 90 at A19, A36-37, A47, A61-62; D.I. 99 at A63, A159)

. One of the co-workers plaintiff had identified as harassing her kept wandering around the spinning machine aisles near her machine although he was not assigned [*8] to the area. (D.I. 90 at A47, A58-61)

. A card bearing the image of a crying baby and the words "Cry Baby" was left on plaintiff's tool belt. (D.I. 90 at A28, A52, A63; D.I. 99 at A52)

. On one occasion, plaintiff's waste tub was moved out of position, requiring her to leave her assignment unattended while she realigned the tub. (D.I. 90 at A49, A62)

. A co-worker plaintiff had identified as harassing her was assigned to a nearby work station. (D.I. 90 at A20; D.I. 99 at A160)

. When plaintiff's supervisor directed her to return a copy of the job assignment chart, which she had removed "to study," two of her co-workers laughed at her. (D.I. 90 at A46-47, A57; D.I. 99 at A55-56)

. Plaintiff returned from lunch one day and discovered a hole in the palm of her

leather work glove; she suspects the glove was cut by a co-worker. (D.I. 90 at A20, A50-51; D.I. 99 at A160)

. Plaintiff received an unsatisfactory performance rating on January 14, 1997. (D.I. 90 at A38; D.I. 99 at A123, A125)

. In contravention of her counselor's alleged instructions, plaintiff's supervisors attempted to contact her to inquire when she would be returning to work approximately [*9] four or five times between January 14, 1997 and July 31, 1997 (while she was out on disability leave). (D.I. 90 at A14, A25; D.I. 99 at A59, A153)

n2 See the court's December 1, 1999 order. (D.I. 56)

n3 The court notes that plaintiff filed discovery requests and received responses from defendant. Although not satisfied with said responses, the court has reviewed the discovery material and denies plaintiff's motions to compel (D.I. 85, 91), given her refusal to discuss with defendant and the court the entry of a protective order in this case, as well as the parameters of the case established by her EEOC complaint and the court's December 1, 1999 order. The court notes as well that plaintiff's hostile work environment and retaliation claims are based particularly on her observations and experiences, as she has related them on the record.

n4 TSIS is a computer system that tracks the efficiency of each spinning machine and SMO. (D.I. 90 at A151) It identifies each spinning machine by number and each SMO by his or her payroll number. (D.I. 90 at A151-52) TSIS can be used to generate reports that detail spinning machine downtime by machine number, position number, and payroll number of the SMO credited with the downtime as well as reports that provide the total downtime, average break delay time, and total number and types of breaks for each identified SMO. (D.I. 90 at A152)

[*10]

n5 Plaintiff contends that on approximately six (6) different occasions her supervisor told her

she was the "problem" and instructed her to be "more social." (D.I. 90 at A16-17, A22-24; D.I. 99 at A50-51, A155-58)

n6 The comment at issue read: "Can't operate without my old man!!!!!"

n7 Although other profane comments were entered into TSIS during the relevant time period, these comments were neither directed at plaintiff nor entered using her payroll number.

### B. Hostile Work Environment

In her complaint, plaintiff contends that the aforementioned conduct created a hostile and abusive work environment. Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has construed Title VII as covering more than "'terms' and 'conditions' [*11] in the narrow contractual sense," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998), finding the statute "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment," Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) (citations and internal quotation marks omitted). Consequently, a plaintiff may establish a violation of Title VII by proving that gender-based discrimination was so pervasive it created a hostile or abusive work environment. See id. at 66. Consistent with this standard, in order for a plaintiff to succeed in a hostile work environment claim, the Court of Appeals for the Third Circuit requires a plaintiff to prove five elements:

> (1) the employee suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior [*12] liability.

Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990) (footnote omitted); accord Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999).

### 1. Gender-Based Discrimination

In the instant action, defendant contends that plaintiff's allegations do not amount to sexual harassment within the purview of Title VII. In so arguing, defendant focuses on the non-sexual nature of the conduct in question, contending that plaintiff's allegations are "not the types of claims that Title VII was enacted to address." (D.I. 89 at 20)

The Supreme Court has interpreted Title VII as affording "employees the right to work in an environment free from discriminatory intimidation, ridicule and insult." Meritor, 477 U.S. at 65. Contrary to defendant's argument, prevailing case law does not limit this right to freedom from ridicule or intimidation of only an explicitly sexual nature. See, e.g., Andrews, 895 F.2d at 1485 ("To constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently [*13] severe to detrimentally affect a female employee."); Hall v. Gus Constr. Co., 842 F.2d 1010, 1014 (8th Cir. 1988) ("Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances."). As the Supreme Court recently recognized,

> the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

523 U.S. at 81-82. The Third Circuit has noted that "intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." Andrews, 895 F.2d at 1485 (internal citations and quotations omitted). According to the Third Circuit, "there are no talismanic expressions which must be invoked as a [*14] condition-precedent to the application of laws designed to protect against discrimination. The words themselves are only relevant for

what they reveal--the intent of the speaker." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996).

A plaintiff, therefore, need not allege overt sexual harassment in order to establish a hostile work environment claim under Title VII. However, a plaintiff does need to "'show that gender is a **substantial factor** in the discrimination, and that if the plaintiff had been a man she would not have been treated in the same manner." Andrews, 895 F.2d at 1485 (internal citations and quotations omitted) (emphasis added). Thus, harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women may serve as evidence of a hostile or abusive work environment. See, e.g., Andrews, 895 F.2d at 1485 (holding that "the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment"; see also Williams v. General Motors Corp., 187 F.3d 553, 564-65 (6th Cir. 1999) [*15] (holding that "**any** unequal treatment of an employee **that would not occur but for the employee's gender** may, if sufficiently severe or pervasive under the Harris standard, constitute a hostile environment in violation of Title VII"); Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 441 (1st Cir. 1997) (stating that "many forms of offensive behavior may be included within the definition of hostile environment sexual harassment. . . . However, the overtones of such behavior must be, at the very least, sex-based so as to be a recognizable form of sex discrimination."); Lipsett v. University of Puerto Rico, 864 F.2d 881, 905 (1st Cir. 1988) (stating that a "[verbal] attack, although not explicitly sexual, was nonetheless charged with anti-female animus, and therefore could be found to have contributed significantly to the hostile environment"); McKinney v. Dole, 246 U.S. App. D.C. 376, 765 F.2d 1129, 1138 (D.C. Cir. 1985) (holding "that any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees may, if sufficiently patterned or [*16] pervasive, comprise an illegal condition of employment under Title VII"). The Supreme Court has cautioned, however, that

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "discrimination . . . because of . . . sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical

issue, Title VII's test indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

Oncale, 523 U.S. at 80 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 25, 126 L. Ed. 2d 295, 114 S. Ct. 367).

In the instant action, plaintiff has failed to demonstrate that gender was a substantial factor in the alleged discrimination. The Third Circuit has directed that discrimination on the basis of sex "is implicit, and thus should be recognized as a matter of course," where a case involves sexual propositions, innuendo, pornographic materials, or sexual derogatory language, but that "[a] more fact intensive analysis [is] necessary [*17] where the actions are not sexual by their very nature." Andrews, 895 F.2d at 1482 n.3. It is apparent from the allegations at bar that plaintiff did not get along with co-workers or supervision and that she was the target of unwelcome attention. There is no evidence in the record, however, indicating that the facially gender-neutral conduct n8 plaintiff alleges was based on perceptions about womanhood or gendered stereotypes of appropriate female behavior rather than factors individual to plaintiff. Although plaintiff alleges instances of unprofessional and spiteful behavior on the part of her co-workers and supervisors, her allegations are devoid of any incidents wherein she was confronted with negative, gender-related comments. Nor does she complain of the use of insulting or derogatory language relating to women generally or herself as a women specifically. Evaluating the record as a whole and in a light most favorable to plaintiff, the court finds no evidence from which a reasonable jury could infer that the harassment plaintiff suffered was motivated by gender-based animus.

n8 None of the conduct plaintiff has identified concerned overtly offensive, sexually-oriented behavior. The only conduct plaintiff considered to be sexual in nature was her supervisor's admonishment that she be "more social." Although she interpreted this comment as implying she should "flirt" with her male co-workers, plaintiff concedes that her supervisor never explicitly said such.

[*18]

## 2. Pervasive and Regular

Even if the court were to assume that the alleged conduct was motivated by gender-based animus, that conduct is not sufficiently "pervasive and regular" n9 to constitute a hostile work environment. To be actionable under Title VII, "the workplace [must be] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993) (citations and internal quotation marks omitted). In considering whether a work environment is hostile or abusive, courts are directed not to examine the scenario on an incident-by-incident basis but to consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; see also Andrews, 895 F.2d at 1485; Williams, 187 F.3d at 563 [*19] ("The totality-of-the-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation."). The Supreme Court has cautioned, however, that Title VII is not meant to be a "general civility code for the workplace." Oncale, 118 S. Ct. at 1002. The statute, therefore, provides no redress for "'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'" Faragher v. Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (quoting Oncale, 118 S. Ct. at 1003). Nor does it protect an individual from occasional teasing, sporadic use of abusive language or gender-related jokes, offhand comments, or isolated or single incidents of harassment (unless "extremely serious"). 118 S. Ct. at 2283-84. As the Supreme Court has "made . . . clear[,] . . . conduct must be extreme to amount to a change in the terms and conditions of employment." Id. at 2284.

n9 The court recognizes that the "pervasive and regular" requirement of Andrews differs slightly from that set forth in Meritor, wherein the Supreme Court stated that alleged sexual harassment must be "severe or pervasive." Meritor, 477 U.S. at 67 (emphasis added). In light of the fact that the Third Circuit has recently cited Andrews with approval in Kunin and Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997), the court will assume that the Andrews "pervasive and regular" test is the governing standard for Title VII cases in this Circuit. In the case at bar, the distinction is not significant, however, as plaintiff has failed to meet the standards of either Andrews or Meritor.

[*20]

While the comments and conduct of plaintiff's co-workers and supervisors may have been unprofessional and offensive, they collectively do not rise to the level of unlawfulness within the purview of Title VII. Unlike other cases involving hostile work environments, there is no evidence here that plaintiff was subjected to inquiries into her sex life, unwanted sexual propositioning, the display of sexual or pornographic material, significantly intrusive obscene language or gestures, improper touching, unreasonable criticism, pervasive antifemale commentary, or misogynist epithets. Compare Andrews, 895 at 1486 (holding that the court on remand should view name calling, pornography, displaying sexual objects on desks, recurrent disappearance of plaintiffs' work product, anonymous phone calls, and destruction of property when considering whether the work environment was hostile); Gares v. Willingborough Township, 90 F.3d 720, 723-24 (3d Cir. 1996) (upholding jury verdict for plaintiff where supervisor referred to her as "Township slut" and "tramp," touched her in a degrading manner, referred to her breasts as "bazooka-size," and laughed when her co-worker joked about [*21] plaintiff's "dildo"); Spain v. Gallegos, 26 F.3d 439, 449-50 (3d Cir. 1994) (holding Andrews requirements were satisfied where plaintiff alleged she was the subject of pervasive rumors that she was involved in a sexual relationship with her superior which arose due to the superior's conduct); Glickstein v. Neshaminy Sch. Dist., 1999 U.S. Dist. LEXIS 727, No. Civ. A. 96-6236, 1999 WL 58578, at *8 (E.D. Pa. Jan. 26, 1999) (finding that evidence was sufficient to raise genuine issue of material fact as to whether conduct was pervasive and regular where plaintiff alleged that she was subjected to a nearly daily routine of harassment, including inappropriate sexual advances, being kissed against her will, having her buttocks grabbed and threatening behavior that interfered with her ability to perform her job); Konstantopoulos v. Westvaco Corp., 893 F. Supp. 1263, 1277 (D. Del. 1994) (upholding jury verdict for plaintiff where plaintiff offered evidence that her locker was vandalized, that she endured crude gestures and remarks, and that she received sexually demeaning letters from co-workers) with Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 715-18 (3d Cir. 1997) [*22] (finding that a hostile or abusive working environment did not exist where plaintiff was required to work in the proximity of employees who had previously harassed her and was subjected to mute gestures, squinting stares, and shaking fists); Gautney v. Amerigas Propane, Inc., 107 F. Supp. 2d 634, 2000 U.S. Dist. LEXIS 10664, 2000 WL 1053563 (E.D. Pa. 2000) (allegations that plaintiff was subjected to "unprofessional, offensive, and callow" conduct and comments, including discussions concerning the size of a male co-worker's "sex organs and his escapades with other women" and comments "that men did not like aggressive women, that [plaintiff] was only using 1/3 of her assets and that she should dress in a skirt and heels," did not amount to severe and pervasive harassment); Bishop v. National R.R. Passenger Corp., 66 F. Supp. 2d 650, 664 (E.D. Pa. 1999) (finding inactionable under Title VII conduct "consisting merely of staring, leering and 'stud muffin' comments, with no physical touching or threats and no sexual overtones"); Pittman v. Continental Airlines, Inc., 35 F. Supp. 2d 434, 442 (E.D. Pa. 1999) (allegations that plaintiff occasionally encountered [*23] individuals who inquired about her personal life and extended conversations about relationships to a "graphic" level did not rise to the level of sexual hostility proscribed by Title VII); LaRose v. Philadelphia Newspapers, Inc., 21 F. Supp. 2d 492, 500 (E.D. Pa. 1998) (allegations that supervisor raised hand at plaintiff, followed her into an office, denied her overtime and computer training, and stood too close to her were insufficient to establish hostile work environment); McGraw v. Wyeth-Ayerst Labs., Inc., 1997 U.S. Dist. LEXIS 20813, No. Civ. A. 96-5780, 1997 WL 799437, at *6 (E.D. Pa. Dec. 30, 1997) (allegation that supervisor repeatedly asked plaintiff out on dates and kissed her against her will insufficient to establish hostile work environment); Cooper-Nicholas v. City of Chester, 1997 U.S. Dist. LEXIS 20810, No. Civ. A. 95-6493, 1997 WL 799443 (E.D. Pa. Dec. 30, 1997) (finding plaintiff's work environment not severely hostile although plaintiff's supervisor consistently made disparaging, vulgar, and offensive comments in public). At most, the evidence shows that over a two-month period n10 plaintiff was subjected to sporadic, unwelcome conduct and disparaging utterances. In sum, [*24] a rational factfinder could not reasonably conclude that the conduct complained of amounts to the "pervasive and regular" harassment that Title VII was enacted to redress.

n10 In fact, according to plaintiff, the majority of the alleged incidents occurred during a one week period in December.

Having determined that plaintiff has failed to present a triable issue of fact with respect to two essential elements of the prima facie case for her hostile work environment claim, summary judgment as to this claim is appropriate. n11

n11 Having so decided, the court need not address defendant's argument that plaintiff has failed to establish the fifth element of the prima facie case, respondeat superior liability.

## B. Retaliation

Plaintiff further alleges that after she complained to supervision of harassment by a co-worker she suffered [*25] reprisals at work. Title VII prohibits discrimination against an employee who has exercised her rights under the Act:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because she [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e-3(a). Claims of retaliation brought pursuant to the Act are analyzed under a burden-shifting framework, the particulars of which vary depending on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Since review of the record does not reveal any direct evidence of retaliation and plaintiff does not purport to assert such, the court will analyze plaintiff's retaliation claim using the burden-shifting framework for "pretext" suits set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). [*26] See Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).

Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case for retaliation under Title VII. In order to do so, a plaintiff must demonstrate by a preponderance of the evidence that: (1) she engaged in protected activity; (2) that defendant took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action. See Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1999). Once plaintiff has established a prima facie case, the burden shifts to defendant to "clearly set forth through the introduction of admissible evidence" reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. See Burdine, 450 U.S. at 254-55. If defendant rebuts the prima facie showing by demonstrating a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination drops from the case, and plaintiff must present [*27] sufficient evidence for a reasonable factfinder

to reject the employer's nondiscriminatory explanation for its decision. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 L. Ed. 2d 105, 120 S. Ct. 2097, 2106 (2000). To successfully rebut the defendant's proffered explanation, "the plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination." Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997) (citations omitted); see also Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (in banc) ("The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible.").

In the instant action, defendant does not dispute that plaintiff engaged in protected activity within the purview of Title [*28] VII when she reported acts of harassment to supervision. Defendant argues, however, that the retaliatory acts alleged by plaintiff do not amount to "adverse employment actions" as that term has been defined by the Third Circuit. In Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997), the Third Circuit held that the "adverse employment element" of a retaliation claim requires that the "retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e-2(a)(1) or (2)." Id. at 1300-01. That provision makes it "an unlawful employment practice for an employer"

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . .;
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's . . . sex . . . .

42 U.S.C. § 2000e-2 [*29] (a). As interpreted in Robinson, this provision proscribes retaliatory conduct other than discharge or refusal to rehire "only if it alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect[s] his [or her] status as an employee.'" Robinson, 120 F.3d at 1300; see

Burlington Indus. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2268, 141 L. Ed. 2d 633 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Consistent with this interpretation, the Robinson court found that allegations of "unsubstantiated oral reprimands" and "unnecessary derogatory comments" did not rise to the level of "adverse employment action" required for a retaliation claim because, while such conduct might constitute harassment, it did not affect the "terms, conditions, or privileges of employment" or future employment opportunities. 120 F.3d at 1301.

Plaintiff [*30] at bar alleges she was retaliated against by her co-workers and supervisors because she complained about harassment at work. (D.I. PP 9, 12, 14) For the most part, the acts that plaintiff identifies as retaliatory are the same as those she claims constitute harassment. They include: (1) being reprimanded for excessive downtime; (2) being reprimanded for "writing notes" in the machine aisle; (3) being told she was the "problem"; (4) being placed on probation for falsifying records; (5) being forced to work adjacent to a co-worker she felt harassed her; (6) being given an "unsatisfactory" rating on January 14, 1997 while on probation; and (7) being terminated from employment with DuPont. (D.I. 90 at A39-43) She also cites as retaliatory behavior supervision's perceived failure to stop the harassment. (D.I. 90 at A39-43) Of these allegations, only those relating to plaintiff's probation and termination could rise to the level of an "adverse employment action" as defined by the Third Circuit. Plaintiff's remaining allegations, although they may constitute harassment, are not sufficient to qualify as retaliation under Title VII. As the Third Circuit has noted, "'not everything that makes [*31] an employee unhappy' qualifies as retaliation, for 'otherwise, minor and even trivial employment actions that an 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" Id. (quoting Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996)). Plaintiff's allegations of oral reprimands and minor employment actions constitute "trivial employment actions" not "serious and tangible enough" to cause a significant change in employment status. n12 Id.

n12 Whether plaintiff's placement on probation constitutes a "significant change in employment status" is a question the court need not address at this juncture since defendant does not dispute plaintiff's characterization of this act as an "adverse employment action."

To the extent that plaintiff's allegations concerning her probation and termination constitute adverse employment actions, defendant has come forward with evidence which, if taken as true, demonstrates there were legitimate, [*32] nonretaliatory reasons for both actions. Specifically, defendant contends that plaintiff and her husband were place on probation for falsifying records. Plaintiff was terminated because she was not released to return to work after six months of disability leave. In reply, plaintiff contends that she has proffered evidence sufficient to create a genuine issue of material fact by demonstrating that defendant's putative justifications are unworthy of credence and that retaliation for her complaints of harassment in fact motivated both decisions.

Defendant's intent in terminating plaintiff's employment and placing her on probation is a factual question. See Walton v. Mental Health Assoc., 168 F.3d 661, 668 (3d Cir. 1999). Therefore, plaintiff can call into question defendant's intent only if she "'raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment.'" Id. (quoting Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 899 (3d Cir. 1987) (in banc)). In the case at bar, however, plaintiff's evidence is insufficient to meet this burden. In her attempt to show that defendant's enunciated reason for placing her on probation [*33] was pretextual, plaintiff first questions the accuracy of TSIS, proffering the affidavit of a former colleague at the Seaford Nylon Plant who avers that TSIS "had many problems," was inaccurate, and was not password protected. Regardless of the veracity of these allegations, plaintiff's collateral attack on the reliability of TSIS does not raise a triable issue of fact concerning the issue of retaliation. When questioned by DuPont management, plaintiff's husband admitted that on a number of occasions he had substituted his payroll number for that of his wife's and that these substitutions often occurred with respect to lengthy break delay periods. (D.I. 99 at 201) Therefore, the accuracy of TSIS is not an issue. Nor does plaintiff's assertion that others used her payroll number without reprisal demonstrate that defendant's treatment of plaintiff was inconsistent with its treatment of other spinning machine operators. There is no indication in the record that any of the individuals cited by plaintiff used her payroll number for the purpose of creating a false impression as to her efficiency as a spinning machine operator, the charge levied by DuPont management against plaintiff and [*34] her husband and which formed the basis for plaintiff's probation. Consequently, comparison with these alleged instances of misuse does not raise an issue of material fact sufficient to preclude summary judgment.

Similarly, plaintiff has failed to demonstrate that defendant's enunciated reason for terminating her employ-

2000 U.S. Dist. LEXIS 12642, *

ment was pretextual. Plaintiff does not dispute that Du-Pont's disability plan provides for a "maximum period [of] six months for any single disability." (D.I. 90 at A119) Nor does she contest that her health care provider refused to release her to return to work after six months of disability leave. (D.I. 90 at A10; D.I. 99 at A136) Instead, she asserts that there were many instances where employees at the Seaford Nylon Plant "received additional benefits of disability or special treatment." (D.I. 99 at 33-35) The record, however, is devoid of any objective evidence in support of this allegation. Likewise, there is no evidence in the record to support plaintiff's claim that her low performance review in January 1997 was unwarranted. Thus, there is no evidence of record from which a reasonable jury could infer that plaintiff's probationary review and termination were [*35] the result of retaliation for her filing complaints of harassment.

In sum, the evidence demonstrates that plaintiff was placed on probation because she falsified records and her employment was terminated because she was not released to return to work after her disability leave. The court concludes that plaintiff has failed to demonstrate directly or circumstantially any "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in defendant's enunciated legitimate reasons for plaintiff's probation and termination from which a reasonable factfinder could rationally find the reasons "'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non[retaliatory] reasons.'" Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (internal citations omitted). Consequently, summary judgment in favor of defendant is proper because plaintiff has failed to present evidence raising a triable issue of material fact concerning the issue of retaliation.

## IV. CONCLUSION

For the reasons stated above, the court concludes that there are no genuine issues of material fact relating to plaintiff's claims of hostile work environment [*36] and retaliation under Title VII. Therefore, defendant's motion for summary judgment shall be granted. An appropriate order shall issue.

LEXSEE 2000 U.S. DIST. LEXIS 4881



Positive
As of: Feb 15, 2007

**DONNA CHILDRESS, Plaintiff, v. DOVER DOWNS, INC., Defendant.**

**C.A. No. 98-206-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2000 U.S. Dist. LEXIS 4881**

**March 31, 2000, Decided**

**NOTICE:** [*1] FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendant's motion for summary judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant filed a motion for summary judgment on claims filed against it alleging discrimination pursuant to the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq.

**OVERVIEW:** Plaintiff submitted an "application for employment" to work for defendant as a mutuel teller. While participating in a training session and later during her employment, plaintiff alleged she was sexually harassed. As a result, she filed suit pursuant to the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq. Defendant moved for summary judgment. The court granted summary judgment in favor of defendant on plaintiff's hostile work environment claim, reasoning that plaintiff failed to show that she suffered intentional discrimination because of her sex. The court also found that there was no causal connection between the protected activity and the adverse employment action to fulfill element three of a prima facie case of retaliation. Next, the court found that plaintiff failed to establish a prima facie case of disparate treatment. The court reasoned that plaintiff failed to show that similarly situated males were

treated more favorably and did not suffer adverse employment actions.

**OUTCOME:** Defendant's motion for summary judgment granted; there were no genuine issues of material fact relating to plaintiff's claims of discrimination under Title VII.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] A party is entitled to summary judgment only when the court concludes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Evidence*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN2] On a motion for summary judgment, the moving party bears the burden of proving that no material issue of fact is in dispute. Once the moving party has carried its

2000 U.S. Dist. LEXIS 4881, *1

initial burden, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN3] On a motion for summary judgment, the court must view all the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. With respect to summary judgment in discrimination cases, the court's role is to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
[HN4] Generally, to state an employment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., a plaintiff may present either direct evidence of discriminatory intent or indirect evidence of discrimination.

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Labor & Employment Law > Discrimination > Disability Discrimination > Proof > General Overview*
*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions > General Overview*
[HN5] In a mixed motives case, once the plaintiff has produced direct evidence that an illegitimate criterion was a motivating factor in an adverse employment decision, both the burden of production and the burden of

persuasion shift to the defendant. The defendant must show by a preponderance of the evidence that it would have made the same employment decision regardless of its discriminatory animus. To come within the Price Waterhouse framework, the evidence presented by the plaintiff must directly reflect a discriminatory animus on the part of a person involved in the decision making process.

*Evidence > Procedural Considerations > General Overview*
[HN6] Direct evidence is evidence which, if believed, proves the fact without inference or presumption.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions > General Overview*
[HN7] In pretext or indirect evidence cases, a plaintiff must first make a prima facie showing of discrimination. A prima facie case is established when a plaintiff demonstrates the following: (1) she is a member of a protected class; (2) she was qualified for the employment position held or desired; (3) she suffered some form of adverse employment action; and (4) circumstances that give rise to an inference of unlawful discrimination. Once the plaintiff has established a prima facie case of employment discrimination, the burden of going forward shifts to the defendant who then is required to articulate a legitimate, nondiscriminatory reason for the challenged employment action.

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*
*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions > General Overview*
[HN8] In pretext or indirect evidence cases, the defendant need only present enough evidence to raise a genuine issue of fact as to whether it discriminated against the plaintiff. If the defendant is successful in meeting its burden of production, the presumption of discrimination created by the prima facie showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely pretext for discriminatory animus. The plaintiff can satisfy her

burden of proof either directly by persuading the fact finder that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
[HN9] Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., is violated by a work environment abusive to employees because of their race, gender, religion, or national origin.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
[HN10] To be cognizable within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Employee Burdens*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN11] In order to establish a hostile work environment, a plaintiff must establish by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee. Specifically, a plaintiff must demonstrate that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*Torts > Vicarious Liability > Employers > Activities & Conditions > General Overview*
[HN12] An employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of the plaintiff victim.

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
[HN13] Under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., a plaintiff must file a complaint with the Equal Employment Opportunity Commission within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if the person has initially instituted proceedings with a state or local agency with authority to grant or seek relief form such practice. 42 U.S.C.S. § 2000e-5(e).

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
[HN14] Title VII of the Civil Rights Act of 1964 (the Act), 42 U.S.C.S. § 2000(e) et seq., prohibits discrimination against an employee who has exercised her rights under the Act: It shall be an unlawful employment practice for an employer to discriminate against any of his employees because she (the employee) has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title. 42 U.S.C.S. § 2000e-3(a)(1997).

*Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN15] Courts analyze Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000(e) et seq., retaliation claims under a burden-shifting framework. A plaintiff must first establish a prima facie case for retaliation under Title VII. In order to state a prima facie case of retaliation under the statute, the plaintiff must show (1) she engaged in a protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.

*Labor & Employment Law > Wrongful Termination > Constructive Discharge > General Overview*

[HN16] Constructive discharge may be an adverse employment action. Constructive discharge is found where an employer knowingly permits conditions of discrimination in employment so unpleasant or difficult that a reasonable person would have felt compelled to resign.

*Labor & Employment Law > Discrimination > Disparate Treatment > Exhaustion of Remedies*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > General Overview*

[HN17] Courts generally are empowered to hear only those employment discrimination claims that have been the subject of a charge timely filed with the Equal Employment Opportunity Commission (EEOC). 42 U.S.C.S. § 2000e-5(f)(1), (3). However, the parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, regardless of the actual scope of the EEOC investigation. Therefore, a court may assume jurisdiction over additional charges only if the acts alleged in the subsequent Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000(e) et seq., suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom. This standard must be applied in accord with the sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the merits.

*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof*
*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Employee Burdens*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*

[HN18] Generally, to state a disparate treatment in employment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e) et seq., a plaintiff must demonstrate that she was singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion. Plaintiff must first state a prima facie case of gender discrimination. She can do so by showing by a preponderance of the evidence that: (1) she is a member of the protected class, (2) she suffered an adverse employment action, and (3) that similarly situated members of the opposite sex were treated more favorably.

**COUNSEL:** Stephen A. Hampton, Esquire, Grady & Hampton, P.A., Dover, Delaware, for plaintiff.

James J. Sullivan, Jr., Esquire, and Katherine R. Witherspoon, Esquire, Klett, Lieber, Rooney & Schorling, Wilmington, Delaware, for defendant.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated March 31, 2000
Wilmington, Delaware

Sue L. Robinson
**District Judge**

## I. INTRODUCTION

Plaintiff Donna Childress filed this action on April 23, 1998 against defendant Dover Downs, Inc. asserting injuries under the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq.. (D.I. 1) This court has jurisdiction pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e-5(f). Before this court is defendant's motion for summary judgment. (D.I. 38)

For the reasons stated below, defendant's motion for summary judgment shall be granted. n1

n1 The court's decision in this case has rendered defendant's argument for summary judgment as to punitive damages moot and, therefore, such will not be discussed in this memorandum opinion.

[*2]

## II. BACKGROUND n2

> n2 The record reviewed for purposes of this summary judgment proceeding includes defendant's opening brief and appendix, plaintiff's answering brief, and defendant's reply brief and appendix. Plaintiff's appendix to her answering brief was excluded from the record by the prior judicial officer for failure to comply with time limitations. The background section, therefore, is mainly comprised of plaintiff's allegations taken from her complaint and various deposition excerpts.

Plaintiff is a white female who is married with two children. (D.I. 40 at A-31) On September 9, 1995 plaintiff submitted an "application for employment" to work for defendant as a mutuel teller. (D.I. 40 at A-1-3) In order to become a mutuel teller, an applicant has to take a teller training class and pass an examination. (D.I. 45, P 2) An applicant would "learn to use the teller computers to properly place bets and pay winning ticket holders" during these training sessions. (D.I. 45, P 2) Plaintiff attended a [*3] training course in November of 1995. (D.I. 40 at A-75) On December 17, 1995 she began working for defendant as a part-time mutuel teller, primarily on the night shift. (D.I. 1, PP 7,8) As a mutuel teller, plaintiff's job was to "sell tickets to customers who placed bets on horse races, either held at Dover Downs' racetrack or 'simulcast' via television from other racetracks." (D.I. 45, P 2) Adam Wise ("AW") was the mutuel manager who supervised the tellers at the time plaintiff began her job. (D.I. 1, P 9)

### A. Alleged Incidents During Plaintiff's Training Session

On the first night of her training session in November 1995, AW greeted plaintiff "by looking her up and down from head to toe in a way that she found rude and disconcerting." (D.I. 1, P 10) On the second night of training, AW allegedly lingered around plaintiff all night and kept trying to talk to her. (D.I. 1, P 11) That same night AW allegedly kicked the back of plaintiff's boots and asked her if she had spurs at home. (D.I. 1, P 12; D.I. 40 at A-45) Also that night, AW "started to massage her back and run his hands down her back." (D.I. 1, P 12; D.I. 40 at A-41) Plaintiff claims she shrugged AW's hands off her back [*4] and he replied, "What, am I making you melt?" (D.I. 1, P 12; D.I. 40 at A-41) Plaintiff's reply was "No, call me crazy but I'm one of those people who doesn't like to be touched." (D.I. 1, P 12; D.I. 40 at A-41) During the rest of the training session AW displayed a "bad attitude" toward plaintiff and belittled her when she posed questions to him regarding her training. (D.I. 1 at P13)

### B. Alleged Incidents During Plaintiff's Employment

Plaintiff alleges that the problems did not stop after she began working for defendant as a mutuel teller on the night shift in December of 1995.

#### 1. December 1995 to April 1996

Plaintiff's allegations during this time period continue to involve AW and the way he treated her and other female tellers. From January to April 1996, AW attempted on numerous occasions to hold plaintiff's hand. (D.I. 1, P 14; D.I. 40 at A-42) He would attempt to reach over the counter to touch plaintiff's hand. (D.I. 40 at A-42) Plaintiff would pull her hand away, saying nothing at all. (D.I. 40 at A-42) AW would become irritated with plaintiff, ask her why she was so miserable, and comment that she always had an "attitude." (D.I. 1 at P17) AW also would [*5] hold other tellers' hands while talking to them. (D.I. 40 at A-42) AW never tried to touch plaintiff after April 1996. (D.I. 40 at A-43)

On one occasion, AW asked plaintiff and another teller, Rebecca Thomas ("RT"), what color bras they were wearing. (D.I. 1, P 18; D.I. 40 at 45-46) Plaintiff did not respond, but RT answered his question. (D.I. 1, P 19; D.I. 40 at A-46) AW again told plaintiff that she was "always so miserable." (D.I. 1, P 19) AW also would tell "off-color sexual jokes" and jokes about minorities, especially blacks, around plaintiff and other female tellers. (D.I. 1, P 27; D.I. 40 at A-46) Plaintiff approximated that this happened between five to ten times. (D.I. 40 at A-46)

On other occasions, AW allegedly would make derogatory comments to the female tellers. (D.I. 1, P 28; D.I. 40 at A-46) For example, plaintiff claims AW would critique her attire or hairstyle. (D.I. 40 at A-46) Plaintiff alleges that some of AW's comments had a double meaning and that it was obvious he wanted female tellers to take a sexual meaning from what he said. (D.I. 1, P 28;

D.I. 40 at A-46)

During this time period, plaintiff claims that AW tried to touch many of the female tellers and [*6] give them "special attention." (D.I. 1, P 20; D.I. 43 at B-10-19, 761, 770, 778, 785) The female tellers who went along with his behavior were treated with favoritism and were treated favorably. (D.I. 1, P 21; D.I. 43 at B-10-19, 770, 774, 775, 778, 798) For example, AW frequently would come up behind RT while she was working to rub her shoulders or put his chin on her shoulder. (D.I. 1, P 23; D.I. 40 at A-111) He told RT that he wished he were the father of her baby. (D.I. 1, P 24; D.I. 40 at A-117) Plaintiff asserts that RT acquiesced in such treatment and, as a result, she received special privileges. (D.I. 1, P 25; D.I. 43 at B-10-19) RT was "permitted to leave her work station and spend time upstairs in the office area even though she was supposed to be working on the line." (D.I. 1, P 25; D.I. 43 at B-10-19) Plaintiff claims that AW did not treat the male tellers in the same manner that he treated the female tellers. (D.I. 1, P 29; D.I. 43 at B-770)

**2. April 1996 to July 1996**

Plaintiff was laid off in April 1996 at the end of the live season and returned to work at the end of July 1996. (D.I. 40 at A-61) In June 1996 ten female tellers from the day shift had a meeting [*7] with Denis McGlynn ("DMcG") (President of Dover Downs) and Frank Wise ("FW") (a general manager and also AW's father) to voice their complaints about the work environment. (D.I. 43 at B-10-19) The tellers present at the meeting included a teller named Susan Keeler ("SK"). (D.I. 43 at B-10)

Many of the complaints made at the meeting involved AW's conduct. (D.I. 43 at B-10-19) Many of the women complained about the AW's favorable treatment of RT. (D.I. 43 at B-10, B-12-16) They objected to AW's repeated threats to fire them for different reasons, e.g., if they had too many cancellations. (D.I. 43 at B-11) They complained that AW would yell at tellers in front of customers and allow customers to call the tellers vulgar names. (D.I. 43 at B-14-15) They also expressed dissatisfaction with the supervisors' attitudes since RT had quit, asserting that the supervisors had been rude and nasty to the tellers. (D.I. 43 at B-15, B-18-19) DMcG delegated the resolution of this situation to FW. (D.I. 43 at B-625)

In July 1996, FW implemented new mutuel employee guidelines. (D.I. 43 at B-31-39) Changes included, but were not limited to, n3 the modification of the dress code, the installment of a [*8] time clock, the addition of head tellers for the night and weekend shifts, and the disallowance of mutuel employees in the Casino and Simulcast Area while in uniform. (D.I. 43 at B-30-39) Employees were "required to treat all others, (patrons, co-workers), in a courteous manner." (D.I. 43 at B-31) In a memorandum dated July 9, 1996, FW informed the tellers of the new chain of command, i.e., head teller, supervisors, general manager harness, and president. (D.I. 43 at B-37) If any of the tellers on the line had a problem, they were to report it to the head teller; if the head teller could not help, he or she would notify a supervisor. (D.I. 43 at B-33)

n3 Plaintiff, in her complaint, lists the following changes:

(a) tellers were told that now they [had] to keep their canceled tickets separate from the paid tickets, and that if they had too many cancellations, they could be fired. This, despite the fact that cancellations were generally because the customer changed [his] mind and decided to cancel the ticket.

(b) tellers were told that management was watching their ticket sales and that if they [did] not sell as many tickets as the other tellers, they [could] be fired. However, every window is not equally busy and the number of tickets sold depends on the location of the ticket window.

(c) the tellers now [had] to punch a time clock and[,] in fact, were the only department at Dover Downs that had one.

(d) tellers [were] no longer allowed to eat behind the line.

(e) tellers who smoke had been able to split up their fifteen minute break so they could smoke

a cigarette, now they had to take the entire fifteen minutes at one time.

(f) the tellers were told that they [had] to button their shirts one button down from the top and their shirts had to be tucked in.

(g) the pregnant tellers were told they had to wear the uniform with black maternity pants, but female employees who worked on the line [and] handled money [were] allowed to wear maternity clothes.

(h) the tellers [were] told they could no longer read behind the line, even on the days when there [were] no tracks running and they [were] not busy. The other people in the line such as program sellers and the people who handled money [were] allowed to read on the line.

(i) the reading material in the tellers break room was taken away and they were only permitted to read racing forms.

(j) tellers were told that they [were] not allowed to fraternize with customers . . . .

(k) tellers were told that if they did not use the employee parking they could be fired.

(l) tellers were told they could have no chewing gum or hard candy.

(m) the night shift tellers had their hours changed and had to work more shifts to maintain full[-]time hours.

(n) the tellers were told that they [could] not leave their terminal without signing in and out.

(D.I. 1, P 35(a)-(n))

[*9]

Plaintiff returned to work in late July 1996. (D.I. 1, P 31; D.I. 40 at A-61) On July 31, 1996, plaintiff signed the new mutuel department regulations put into effect by FW. (D.I. 40 at A-60, A-12) Plaintiff and other tellers were told that the rule changes and the installation of head tellers were a result of the meeting the day shift women had had with management in June 1996. (D.I. 1, P 33; D.I. 43 at B-761) This information created some hostility on the part of the night and weekend shift tellers towards the day shift tellers. (D.I. 43 at B-761) Shortly thereafter, SK, one of the day shift women who had met with management, had her hours changed from day shift to night shift. (D.I. 43 at B-772) Plaintiff was the only night shift teller who would associate with her; no other tellers would speak to her because of the hostility. (D.I. 43 at B-772)

### 3. August 1996 to December 1996

Plaintiff worked with SK intermittently throughout the time period from July 1996 to November 1996, when SK was fired. (D.I. 1, P 49) While they worked together, SK shared with plaintiff many of her complaints about defendant. n4 SK had similar complaints to those made by plaintiff and, on occasion, [*10] she brought them to the attention of management. (D.I. 43 at B-770-776) According to SK, management did not make any effort to address the problems and in October of 1996, she informed management she was going to file a complaint with the Labor Board. (D.I. 43 at B-772) On November 22, 1996, SK was fired, allegedly because she was not doing a good job and because of absenteeism. (D.I. 43 at B-772) Shortly before SK's termination, SK and plaintiff had lunch together. (D.I. 43 at B-772) The friendly relationship plaintiff and SK shared was closely watched by management. (D.I. 43 at B-772)

n4 SK told plaintiff:

(a) From the time she began working at Dover Downs, she became the object of unwanted attention from AW.

(b) On one occasion, AW grabbed SK's hair and said "you mean to

tell me you actually got your hair
cut like that."

(c) On another occasion AW
grabbed SK's finger and bent it
back causing her severe pain.

(d) AW would swear at SK.

(e) That the stress at work had
caused her health problems
resulting in a leave of absence
from work.

(D.I. 1, P 49(a)-(e))

[*11]

In October of 1996 a co-worker, Kristy Tyler
("KT"), became angry with plaintiff over a change in
the work schedule. (D.I. 1, P 55; D.I. 40 at A-21) Plaintiff
alleges that later in the month, KT's boyfriend "keyed"
her car while it was parked in the parking lot. (D.I. 40 at
A-56) On the night plaintiff noticed her car had been
keyed, KT's boyfriend came in to where they worked,
looked at plaintiff, looked at KT, nodded in a "yes"
motion, and walked back out. (D.I. 40 at A-21, 56) No
words were spoken between KT and her boyfriend. (D.I.
40 at A-21, 56) After her boyfriend had left, KT
announced to everyone that they had better watch their
cars because she heard "cars are getting tore up in the
parking lot." (D.I. 1, P 56; D.I. 40 at A-21, 56)

Plaintiff reported this incident to FW on October 28,
1996. (D.I. 1, P 57; D.I. 40 at A-21, 56) Management was
supportive of plaintiff, and FW even offered to allow her
to park in a space that was monitored by a video camera.
(D.I. 1, P 57; D.I. 40 at A-21) A few days later, plaintiff
and KT passed each other on the main line and KT said to
plaintiff, "you asshole." (D.I. 40 at A-21) Plaintiff
reported this incident to Jean Rawlings ("JR"), one [*12]
of the supervisors. (D.I. 40 at A-21) JR never said
another word to plaintiff about this incident, so plaintiff
called FW about it two weeks later. (D.I. 40 at A-21) FW
knew nothing about the incident when plaintiff called.
(D.I. 40 at A-21)

Sometime in late November 1996, Carl Anderson
("CA"), a supervisor, asked plaintiff to write a letter
about a male teller who CA thought was gay. (D.I. 43 at
B-790) CA told plaintiff what he wanted her to say in the
letter, but plaintiff had never seen or heard the teller do
any of the things CA had mentioned. (D.I. 43 at B-790)

CA became angry with plaintiff when she refused to
write the letter he had requested. (D.I. 43 at B-790-791)

After SK was fired, she wrote a letter dated
December 6, 1996 to defendant's president, DMcG. (D.I.
1, P 53; D.I. 40 at A-5-7; D.I. 43 at B-773) In her letter,
not only did SK express her own complaints, she let
DMcG know that other female tellers had similar
complaints. (D.I. 40 at A-5-7) SK did not name plaintiff
in her letter, but she did make reference to situations that
involved plaintiff. (D.I. 40 at A-5-7; D.I. 43 at B-773)
For example, she wrote about a teller who recently had
had her car "keyed." (D.I. [*13] 40 at A-7; D.I. 43 at
B-773) Plaintiff is the only teller who had had this
happen to her. (D.I. 43 at B-773) SK was referring to
plaintiff when she wrote about a teller who "told [AW]
she didn't like to be touched and that she didn't want him
to hold her hand." (D.I. 40 at A-7; D.I. 43 at B-773)
Plaintiff was not aware that SK had written this letter
until after she had left defendant's employ. (D.I. 1, P 54;
D.I. 40 at A-25)

In early to mid-December 1996, plaintiff's problems
with KT began to resurface. (D.I. 40 at A-22) Laura
Kenton ("LK"), another teller, was working with KT and
plaintiff when KT called LK a "bitch." (D.I. 40 at A-21)
Plaintiff did not hear this, but when LK reported the
incident to JR she implicated plaintiff. (D.I. 40 at
A-21-22) Another time that LK went to JR to complain
about KT, JR told LK to "stay out of it. The whole thing
was between [KT] and [plaintiff]." (D.I. 40 at A-22) JR
began to take KT and KT's sister under her wing, and the
more she favored them, the more plaintiff suffered. (D.I.
40 at A-22)

### 4. January 1997 to March 1997

Plaintiff claims that she always was one of the "most
productive tellers and had been told by management that
[*14] she was one of the fastest tellers and that she was
pleasant to get along with." (D.I. 1 at P60) During this
time period, plaintiff was not aware that her file
contained any written documentation of deficiencies in
her performance or that she had ever been disciplined by
management. (D.I. 1 at P60)

Plaintiff was given a yearly evaluation in the first or
second week of January 1997. (D.I. 40 at A-22, A-49)
Her evaluation score was only one point above
satisfactory. (D.I. 1, P 63; D.I. 40 at A-22) As a result of
this score, plaintiff was given a raise of twenty-five cents,

rather than fifty cents. (D.I. 40 at A-22) Plaintiff felt as though the evaluation was not a fair assessment and, therefore, questioned it, although she never asked for it to be changed. (D.I. 40 at A-49) CA and JR, plaintiff's supervisors, told plaintiff the reason for her low score was the problems involving KT and the complaints they had been receiving about plaintiff for months. (D.I. 40 at A-22) Plaintiff was never called into the office regarding these complaints. (D.I. 40 at A-22) Plaintiff only signed the evaluation after she was told she could have a copy of it. (D.I. 40 at A-22) After all the evaluations [*15] were done, plaintiff was told that no one could receive a copy of his/her evaluation. (D.I. 40 at A-22)

During the months of January through March 1997, plaintiff alleges that management constantly harassed her by calling her to the office every week with new complaints about her behavior. (D.I. 1, P 102; D.I. 40 at A-32) According to plaintiff, whenever she would file a complaint, management would just sigh, roll their eyes, and stare at the wall. (D.I. 40 at A-44)

When plaintiff reported to work on January 22, 1997, there was a mandatory meeting for the employees. (D.I. 1 at P68, D.I. 40 at A-22) Prior to this day, CA had told plaintiff that plaintiff could not attend the meeting because she needed to remain working on the line. (D.I. 1, P 68; D.I. 40 at A-22) The head teller that night, Joan Biddle ("JB"), asked the tellers whether they wanted to attend the meeting. (D.I. 40 at A-22) Plaintiff responded that CA had told her to remain working and, therefore, she could not attend the meeting. (D.I. 40 at A-22) About forty-five minutes after the meeting had started, plaintiff was told to hurry up and turn her machine off as she was wanted upstairs. (D.I. 1, P 69; D.I. 40 at A-22) [*16] Plaintiff thought she was wanted in the office. (D.I. 1, P 69; D.I. 40 at A-22) Instead, plaintiff was brought into the middle of the meeting, where everyone looked at her when she walked in. (D.I. 1, P 69; D.I. 40 at A-22) One of the topics discussed at the meeting was the willingness of employees to face the person about whom they make an accusation. (D.I. 1, P 70; D.I. 40 at A-22-23)

After the meeting was over, plaintiff returned to the line. (D.I. 1, P 71; D.I. 40 at A-23) While she was working, JB began to recap the meeting, especially making reference to discussions concerning gossiping, starting rumors, and the need for employees who make accusations to face the accused. (D.I. 1, P 71, 72; D.I. 40 at A-23) At that point, plaintiff interjected "that

management would not tell her who had been accusing her of things or allow her to face them." (D.I. 1, P 73; D.I. 40 at A-23) JB began to scream loudly at plaintiff. (D.I. 1, P 74; D.I. 40 at A-23) Immediately, JB began accusing plaintiff of constantly walking up and down the line gossiping about KT. (D.I. 1, P 75; D.I. 40 at A-23) Plaintiff denied these allegations and offered that her computer printouts as proof that she was at [*17] her machine punching tickets and not walking up and down the line. (D.I. 1, P 76; D.I. 40 at A-23)

After the screaming incident, plaintiff went up to the third floor office to speak with her supervisors, CA and JR. (D.I. 1, P 77; D.I. 40 at A-23) She told them about JB bringing her into the middle of the meeting and screaming at her in front of customers. (D.I. 1, P 78; D.I. 40 at A-23) CA called JB to the office to find out what happened. (D.I. 1, P 78; D.I. 40 at A-23) JB told CA that plaintiff was gossiping about KT, and "she had to shout to snap [her] out of it." (D.I. 1, P 78; D.I. 40 at A-23) Eventually, although JB attempted to prevent him from doing so, CA agreed to go downstairs to speak with the other tellers who were present when the screaming incident occurred. (D.I. 1, P 79; D.I. 40 at A-23) When CA returned, he stated that the two witnesses confirmed plaintiff's story; this angered JB. (D.I. 1, P 80; D.I. 40 at A-23) JB pointed her finger at plaintiff and yelled, "I see how you are," then gave plaintiff a dirty look and stormed out of the room. (D.I. 1, P 81; D.I. 40 at A-23) Plaintiff, JB, and the eye witnesses were told by management to pretend the whole thing had [*18] never happened and not to talk about it to anyone. (D.I. 1, P 82; D.I. 40 at A-23) When everyone returned to the line, JB was slamming things and tried to close plaintiff's arm in her drawer every chance she could get. (D.I. 40 at A-23)

Throughout the months of January to March 1997, JB would elbow plaintiff in the back at least once a night whenever they worked together. (D.I. 1, P 66; D.I. 40 at A-44) Plaintiff and JB worked together approximately every other week. (D.I. 40 at A-44) Plaintiff spoke with CA twice about these incidents. (D.I. 40 at A-44) The first time plaintiff spoke with CA, he told her he would talk to JB, but the elbowing did not stop. (D.I. 40 at A-44) The second time plaintiff spoke to CA was her last day at work. (D.I. 40 at A-44)

Another incident occurred in February 1997. (D.I. 1, PP 87, 97; D.I. 40 at A-43) As plaintiff and a male manager were passing each other in the hallway, he

"headed towards [her] at full speed [,] took his shoulders and forcibly hit [her] . . . like a hockey player would give a body check." (D.I. 40 at A-43) He neither apologized, nor looked back at plaintiff. (D.I. 40 at A-43) Plaintiff did not report the incident to management. [*19] (D.I. 40 at A-43)

Sometime between January and March, most likely February, plaintiff was brought to the management office by this same male manager because he believed her to have been seven hundred and some dollars short when she turned in her money bag. (D.I. 40 at A-51) He told plaintiff, "Luckily, for you, I went to your machine and you had left all your money at your machine and you had only turned in change." (D.I. 40 at A-51) Plaintiff insists that she did not forget to put the money in the bag, that her husband witnessed her putting the money in the bag, and that the entire story was fabricated. (D.I. 40 at A-51)

Plaintiff worked the whole day on March 17, 1997. (D.I. 40 at A-24) AW was giving plaintiff dirty looks the entire day and plaintiff could not understand why. (D.I. 40 at A-24) That day she said "hello" to FW, and he just turned his head. (D.I. 40 at A-24) AW was flirting with another teller throughout the day. (D.I. 40 at A-24) AW was hugging and touching this teller, who allegedly was receptive to his advances. (D.I. 40 at A-24) For example, she handed AW a rolled up napkin and when he opened it a quarter fell out; the napkin read, "if you can't come call." (D. [*20] I. 40 at A-24) This teller was willing to go along with AW; therefore, she received more hours a week than others who had been there for over a year, such as plaintiff. (D.I. 40 at A-24)

At the end of the day, plaintiff was told to go up to the office after she finished work. (D.I. 40 at A-24) When she got to the office, CA handed her a counseling sheet. (D.I. 40 at A-10, A-24) The sheet stated that plaintiff had used foul language about a fellow teller and that she was spreading rumors about fellow tellers. (D.I. 40 at A-24) When plaintiff asked for an explanation, CA told her that JB had heard plaintiff call her a "black bitch." CA also told plaintiff that JB said plaintiff was talking about the incident that had occurred between the two of them in January and that there were other complaints regarding rumors about fellow tellers. (D.I. 40 at A-24) Plaintiff insisted that she never said these things and that JB was lying. (D.I. 40 at A-24) Plaintiff asked for a meeting to face her accusers, and CA said he would arrange it, but he never did. (D.I. 40 at A-24) Plaintiff did not want to

sign the counseling sheet, but CA told her that signing it was not an admittance of guilt but only an [*21] acknowledgment that he had spoken with her. (D.I. 40 at A-24) Plaintiff signed the letter and left the office crying. (D.I. 40 at A-24) When plaintiff called CA later that night to discuss her counseling sheet, she informed him that she felt she needed to contact a lawyer to find out her rights. (D.I. 40 at A-25)

On March 20, 1997 plaintiff went to Dr. John Asman's office to ask for a new medication for her stomach pain. n5 (D.I. 40 at A-25) Plaintiff explained to the doctor what she had endured at work and that the stress had worsened not only her stomach problem but also her neck and back problem. (D.I. 40 at A-25) The doctor advised plaintiff not to go back to her position and wrote a letter containing this advice. (D.I. 40 at A-25) Later that same day, plaintiff, accompanied by her husband, went to work. (D.I. 40 at A-25) As she and her husband walked in, AW was standing midway down the main line. (D.I. 40 at A-25) When he saw the two of them, AW ran back to the office and announced their arrival. (D.I. 40 at A-25) When plaintiff arrived at the office, plaintiff handed CA the note her doctor had written. She asked him to put it in her file as it was the reason she would not be [*22] back to work. (D.I. 40 at A-25)

> n5 Since approximately the spring of 1996, plaintiff has had a problem with her stomach. (D.I. 40 at 77-80) Her medication for this condition has changed three times since January 1997. (D.I. 40 at A-25) Beginning in January 1997, plaintiff also began taking muscle relaxers and anti-inflammatory pills for stress and tension in her back. (D.I. 40 at A-25)

## III. STANDARD OF REVIEW

[HN1] A party is entitled to summary judgment only when the court concludes "that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). [HN2] The moving party bears the burden of proving that no material issue of fact is in dispute. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" [*23] Id. at 587 (quoting Fed. R. Civ. P. 56(e)). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). [HN3] This court, however, must "view all the underlying facts and all reasonable inferences therefrom in the light most favorable [*24] to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" Revis v. Slocomb Industries, Inc., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)).

[HN4] Generally, to state an employment claim under Title VII, a plaintiff may present either direct evidence of discriminatory intent under Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989) ("mixed motives" cases) or indirect evidence of discrimination under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981) [*25] ("pretext" cases). [HN5] In a mixed motives case under Price Waterhouse, once the plaintiff has produced direct evidence that an illegitimate criterion was a motivating factor in an adverse employment decision, both the burden of production and

the burden of persuasion shift to the defendant. See id., 490 U.S. 228 at 277. The defendant must show by a preponderance of the evidence that it would have made the same employment decision regardless of its discriminatory animus. See id. at 244-46. To come within the Price Waterhouse framework, the evidence presented by the plaintiff "must directly reflect a discriminatory . . . animus on the part of a person involved in the decision making process." Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994); see also Ostrowski v. Atlantic Mutual Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992). "[HN6] 'Direct evidence is evidence which, if believed, proves the fact without inference or presumption.'" Nixon v. Runyon, 856 F. Supp. 977, 983 (E.D. Pa. 1994) (quoting Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1993)); Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1223 (11th Cir. 1993) [*26] ("Evidence [of discrimination] is direct when it is sufficient to prove discrimination without inference or presumption.").

[HN7] In contrast, in pretext or indirect evidence cases, a plaintiff must first make a prima facie showing of discrimination. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). A prima facie case is established when a plaintiff demonstrates the following: (1) she is a member of a protected class; (2) she was qualified for the employment position held or desired; (3) she suffered some form of adverse employment action; and (4) circumstances that give rise to an inference of unlawful discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410-412 (3d Cir. 1999). Once the plaintiff has established a prima facie case of employment discrimination, the burden of going forward shifts to the defendant who then is required to articulate a legitimate, nondiscriminatory reason for the challenged employment action. See McDonnell Douglas, 411 U.S. at 802-03; Burdine, 450 U.S. at 252-55; Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175, 179 (3d Cir. 1985). [*27] [HN8] The defendant need only present enough evidence to raise a genuine issue of fact "as to whether it discriminated against the plaintiff." Burdine, 450 U.S. at 254-55. If the defendant is successful in meeting its burden of production, the presumption of discrimination created by the prima facie showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely pretext for discriminatory animus. See id. at 256. The plaintiff can satisfy her burden of

proof "either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id.; see also Armbruster, 32 F.3d at 783. At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).

## IV. DISCUSSION

It is difficult to discern exactly what plaintiff claims [*28] in this lawsuit. Although she has enumerated in great detail a great number of facts, plaintiff has left it to defendant and, ultimately, the court to characterize the facts as legal causes of action. The court, as did the defendant, construes the facts and their legal consequences liberally.

### A. Hostile Work Environment (Sexual Harassment)

The Supreme Court has recognized that [HN9] Title VII is violated by a "work environment abusive to employees because of their race, gender, religion, or national origin." n6 Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986) ("[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."). [HN10] To be cognizable within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Sav. Bank, FSB, 477 U.S. at 67 (quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982)). [*29] [HN11] In order to establish a hostile work environment,

a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee."

Andrews v. City of Philadelphia, 895 F.2d 1469, 1482

(3d Cir. 1990) (quoting Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989)). Specifically, a plaintiff must demonstrate that:

(1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

Id.; see Faragher v. City of Boca Raton, 524 U.S. 775, 786-88, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998). [HN12] An "employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of the plaintiff [*30] victim." Faragher, 524 U.S. at 775.

n6 It shall be an unlawful employment practice for an employer

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).

[HN13] Under Title VII, a plaintiff must file a complaint with the EEOC within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if the person has initially instituted proceedings with a state or local agency with authority to grant or seek relief form such practice. See 42 U.S.C. § 2000e-5(e). In the instant action, plaintiff filed her charge of discrimination on March 31, 1997 with the Delaware Department of Labor. Her Title VII action, therefore, would normally include only those incidents alleged to [*31] have occurred in the preceeding three hundred day

period, i.e., those events occurring after June 4, 1996. Events occurring prior to this date are considered untimely. Therefore, plaintiff is precluded from averring in support of her hostile work environment claim any allegations of sexual harassment that occurred prior to June 4, 1996. (D.I. 40 at A-27) As a result, plaintiff's allegations that AW sexually harassed her from the time she started her training in November 1995 to the time defendant terminated her employment in April 1996 are time barred. n7 Plaintiff admits that AW never tried to touch her after April 1996, a concession that is supported by the record.

> n7 Plaintiff does not allege a continuing violation, and even if she were to do so, the acts alleged have occurred outside the limitations period are not continuous in time with the timely acts alleged. This discontinuity is fatal to a continuing violation argument.

In light of the above, the only remaining basis for plaintiff's hostile work environment [*32] claim is her assertion that she was subjected to a continuing pattern of retaliation from management and supervisors. Plaintiff contends that this retaliation was a result of the meeting management had with female tellers in June 1996, regarding the alleged sexual harassment by AW. (D.I. 43 at B-10-19) Although the discriminatory conduct forming the basis of a hostile work environment claim is "not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee," Andrews, 895 F.2d at 1485, the court finds that plaintiff has not established a prima facie case. Plaintiff did not participate in, and her name was never mentioned during, the June 1996 meeting. Moreover, the alleged retaliatory conduct did not begin until December 1996, six months after the tellers met with management. n8 Furthermore, the conduct plaintiff complains about involves treatment she received from female supervisors. Plaintiff has not provided the court with any evidence from which it could be reasonably inferred that the alleged retaliatory actions were taken by defendant merely because of her gender. [*33] Therefore, plaintiff has failed to establish the first element of a prima face case. Accordingly, the court shall grant summary judgment in favor of defendant on plaintiff's hostile work environment claim.

> n8 Plaintiff admits that in October 1996 management was supportive when she went to them to complain about her car being keyed in the parking lot. (D.I. 40 at A-21) Plaintiff's first allegation that involves retaliatory conduct by management or a supervisor concern conduct that occurred in mid-December 1996. (D.I. 40 at A-22)

**B. Retaliation**

[HN14] Title VII prohibits discrimination against an employee who has exercised her rights under the Act:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because she [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this [*34] title.

42 U.S.C. § 2000e-3(a)(1997); Price v. Delaware Dep't of Correction, 40 F. Supp. 2d 544, 551 n.5 (D. Del. 1999). [HN15] Courts analyze Title VII retaliation claims under the same burden-shifting framework outlined earlier. See Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). A plaintiff, therefore, must first establish a prima facie case for retaliation under Title VII. In order to state a prima facie case of retaliation under the statute, the plaintiff must show (1) she engaged in a protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. See id.; Robinson v. City of Pittsburgh, 120 F.3d 1286, 1289 (3d Cir. 1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); Price, 40 F. Supp. 2d at 551-52.

In the case at bar, plaintiff has failed to establish a prima facie showing of retaliation. Plaintiff provides no evidence that she engaged in a protected [*35] employee activity, the touchstone element of a retaliation claim. The record demonstrates that plaintiff never "opposed

any practice made an unlawful employment practice by [Title VII];" moreover, plaintiff never "made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a). Plaintiff did not complain to management that she was being sexually harassed; she was not one of the female tellers who went to management in April 1996 and her name was never mentioned in that meeting. (D.I. 43 at B-10) Although filing a charge of discrimination with the EEOC is a protected activity, plaintiff did not do so until after she resigned in March 1997. See Robinson, 120 F.3d at 1300; Woodson, 109 F.3d at 920.

Plaintiff contends that her "involuntary involvement" in SK's letter to the president of defendant was a protected activity. In her December 1996 letter, SK made reference to plaintiff, but never mentioned her by name. (D.I. 40 at A-5-7; D.I. 43 at B-773) There is no evidence to show that management had any idea the letter was referencing plaintiff. [*36] (D.I. 47 at P5; D.I. 48 at P2) Although plaintiff was friendly with SK and SK's sister, that does not make her a participant, in any form, in a protected activity. (D.I. 43 at B-772) Plaintiff argues that she engaged in a protected activity when she refused to write a letter for management about a gay male teller. (D.I. 43 at B-790-791) The court finds that this single nonevent does not constitute "opposition to any practice made an unlawful employment practice" by Title VII.

Even if the court were to assume that plaintiff engaged in a protected activity, the court finds that plaintiff has not shown an adverse employment action taken by defendant sufficient to fulfill the second element of a prima facie case. "The Third Circuit has articulated that 'retaliatory conduct other than discharge or refusal to rehire is ... proscribed by Title VII only if it alters the employees' compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affect[s] his status as an employee.'" Price, 40 F. Supp. 2d at 552 (citing Robinson, 120 F.3d at 1300)(emphasis added). According to the Third Circuit [*37] in Robinson, "not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Robinson, 120 F.3d at 1300. The employer's retaliatory conduct must be both "serious and tangible." Id.

Plaintiff alleges that she received an unwarranted low performance review from defendant in January 1997. (D.I. 40 at A-49) There is no evidence to support plaintiff's claim that her review was unwarranted other than her own belief that she deserved a higher score. As a result of this review, plaintiff received a satisfactory score and a twenty-five cent raise. (D.I. 40 at A-22) Plaintiff did not quit when she received her evaluation. Although plaintiff did question management about her score, she never requested that it be changed. (D.I. 40 at A-49)

[HN16] Constructive discharge may be an adverse employment action. See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999). Plaintiff at bar does not argue directly that she was constructively discharged; however, the court will address [*38] the issue, construing the claims and record liberally. Constructive discharge is found where an employer knowingly permits "conditions of discrimination in employment so unpleasant or difficult that a reasonable person would have felt compelled to resign." Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998). Plaintiff alleges that she was subjected to the following acts of reprisal: she received an unwarranted low performance review; she received several verbal counselings and one written counseling from management; her supervisor (a female) brought her into the middle of a meeting to embarrass her; her supervisor (a female) elbowed her in the back and tried to close her arm in the drawer approximately ten times; and another supervisor (a male) tried to "body check" her in the hallway. These incidents, coupled with her doctor's advice not to return to work, prompted plaintiff to resign. (D.I. 40 at A-25) The court finds that these allegations do not rise to the level of employer action that would "compel a reasonable person to resign." See generally Robinson, 120 F.3d 1286, 1300-01 (finding that plaintiff's alleged "unsubstantiated oral [*39] reprimands" and "unnecessary derogatory comments" did not rise to the level of what the Third Circuit has described as "adverse employment action").

Even if the court were to find that plaintiff was constructively discharged, there is no causal connection between what she claims to have been the protected activity (her alleged involvement in SK's letter) and the problems that led to her resignation. Plaintiff argues that the substantial and continuous harassment she alleges was at the request of management, because of the letter sent by SK. However, as mentioned above, there is no

evidence to suggest that management knew plaintiff was referenced in this letter. Therefore, even if plaintiff were to have met element one by her "involuntary involvement" in SK's letter, and to have met element two through constructive discharge, this court finds that there is no causal connection between the protected activity and the adverse employment action to fulfill element three of a prima facie case of retaliation. n9

> n9 The Third Circuit has stated that "temporal proximity between the protected activity and the termination is sufficient to establish a causal link." Woodson, 109 F.3d at 920-21. The timing as alleged by plaintiff is SK's December 6, 1996 letter and plaintiff's March 20, 1997 resignation.

[*40]

### C. Disparate Treatment

In an effort to predict what causes of action plaintiff might assert at trial, defendant has addressed the theory of disparate treatment. Plaintiff did not directly address a claim of disparate treatment in her charge of discrimination to the EEOC. (D.I. 40 at A-27) [HN17] Courts generally are empowered to hear only those employment discrimination claims that have been the subject of a charge timely filed with the EEOC. See 42 U.S.C. § 2000e-5(f)(1), (3). However, the parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are "'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination,'" regardless of the actual scope of the EEOC investigation. Hicks v. ABT Assocs., Inc., 572 F.2d 960, 966 (3d Cir. 1978) (quoting Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976)). Therefore, a court may assume jurisdiction over additional charges only if "the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation [*41] arising therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)). This standard must be applied in accord with the "sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the merits." Revis, 814 F. Supp. at 1216 (quoting Gooding v. Warner-Lambert Co., 744 F.2d 354, 358-59 (3d Cir. 1984)).

Where the allegations in the complaint were sufficiently distinct from those presented in the EEOC charge and were not part of the EEOC investigation, courts have refused to entertain the expanded claims until administrative procedures have been exhausted. See Sandom v. Travelers Mortgage Servs., Inc., 752 F. Supp. 1240, 1246-48 (D.N.J. 1990); Zalewski v. M.A.R.S. Enters., Ltd., 561 F. Supp. 601, 604-05 (D. Del. 1982). Nonetheless, courts have heard claims not specifically mentioned in the prior EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaints. See Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984); [*42] Ostapowicz, 541 F.2d at 398-99.

Courts often have stated that "'the nature of the required showing' to establish a prima facie case of disparate treatment based on indirect evidence 'depends on the circumstances of the case.'" Marzano v. Computer Science Corp.,, 91 F.3d 497, 503 (3d Cir. 1996)(citing Torre v. Casio, Inc., 42 F.3d 825, 830 (3d Cir. 1994)(citation omitted)). [HN18] Generally, to state a disparate treatment in employment claim under Title VII, a plaintiff must demonstrate that she was "singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion." Equal Employment Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990). Plaintiff must first state a prima facie case of gender discrimination. See McDonnell Douglas, 411 U.S. at 802.; Marzano, 91 F.3d at 503. She can do so by showing by a preponderance of the evidence that: (1) she is a member of the protected class, (2) she suffered an adverse employment action, and (3) that similarly situated members of the opposite sex were treated more favorably. [*43] See McDonnell Douglas, 411 U.S. at 802; Stinson v. Delaware River Port Auth., 935 F. Supp. 531, 539 (D.N.J. 1996).

Plaintiff at bar fails to establish a prima facie case. Although plaintiff, a female, is a member of a protected class, she has failed to show that similarly situated males were treated more favorably and did not suffer adverse employment actions. Plaintiff generally alleges that male tellers were not treated in the same disrespectful manner that female tellers were, but she fails to provide sufficient evidence for comparison of the treatment of similarly situated female and male employees.

Plaintiff argues that she received several verbal

2000 U.S. Dist. LEXIS 4881, *43

counselings and one written counseling, but the record reveals that both males and females received oral and written counselings. (D.I. 40 at A-113) Plaintiff argues that qualified females were passed up for promotions while less qualified males were promoted. (D.I. 1 at PP 37-40) As to this issue, the record reveals that both male and female tellers received promotions to head teller. Additionally, plaintiff alleges that her supervisors failed to oust abusive customers at female tellers' requests, [*44] but did so when male tellers so requested. (D.I. 1 at PP 93-94) There is no evidence supporting this allegation. In sum, aside from plaintiff's conclusory allegations, there is no evidence in the record that males were treated more favorably than females while employed by defendant. Therefore, plaintiff, has not met her burden of proof to establish a prima facie case for a Title VII disparate treatment claim.

Even assuming plaintiff has established a prima facie case, defendant has provided a legitimate, non-discriminatory reason for its actions, shifting the burden back to the plaintiff. Burdine, 450 U.S. at 254-56. Defendant has stated that management received complaints about plaintiff from other tellers, two of whom reduced their complaints to writing and, therefore, had reason to counsel plaintiff. (D.I. 40 at A-8,9) The record shows that plaintiff and other tellers violated some of the mutuel department's regulations by being discourteous to co-workers and, therefore, defendant had reason to counsel them. The burden then shifts back to plaintiff to show by a preponderance of the evidence that defendant's reasoning is pretextual. Burdine, 450 U.S. at 256. [*45] Plaintiff failed to address this claim in her answering brief and, therefore, has failed to meet her burden of showing defendant's proffered reason was merely pretext for discriminatory animus. See id.

## V. CONCLUSION

For the reasons stated above, the court concludes that there are no genuine issues of material fact relating to plaintiff's claims of discrimination under Title VII. Therefore, defendant's motion for summary judgment shall be granted. An appropriate order shall issue.

Not Reported in F.Supp.2d                                                                              Page 1
Not Reported in F.Supp.2d, 1999 WL 179693 (E.D.Pa.)
**(Cite as: 1999 WL 179693 (E.D.Pa.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Graynle EDWARDS, Plaintiff,
v.
CHESTER UPLAND SCHOOL DISTRICT, Chester
Upland School District Board of
Control, and John Tommasini, Defendants.
**No. CIV. A. 96-7162.**

March 24, 1999.
Paul J. Drucker, Law Offices Bernard M. Gross, P.C.,
Paul J. Drucker, the Law Offices of Peter McNamara,
Philadelphia, for Graynle Edwards, Ed.D., Plaintiffs.

Leo A. Hackett, Media, for Chester Upland School
District, Chester Upland School District Board of
Control, John Tommasini, Defendants.

MEMORANDUM
GAWTHROP, J.

**\*1** On July 29, 1998, I granted partial summary judg-
ment in this case and ordered plaintiff "reinstated
with backpay, benefits, and accrued seniority." July
29, 1998 order at 2. Defendants appealed, but the
Third Circuit dismissed the appeal. *Edwards v.
Chester Upland Sch. Dist.,* No. 98-1739 (3d Cir. Dec.
1, 1998). Thus, all that remains is the calculation of
plaintiff's lost back pay.

*Duty to Mitigate*

A plaintiff's damages are reduced by the amount by
which he is able to mitigate his damages by taking
other employment which can be found through a
reasonable effort. *See Somerset Area Sch. Dist. v.
Starenchek,* 599 A.2d 252, 254 (Pa.Commw.1991);
*Ellis v. Ringgold Sch. Dist.,* 832 F.2d 27, 30 (3d
Cir.1987). Pension payments are not offset against re-
covery. *See McDowell v. Avtex Fibers,* 740 F.2d 214,
217 (3d Cir.1984) (pension payments not deducted
from back pay award); *Ross v. Unified Sch. Dist. No.*

231, 1993 WL 62442 at * 7-9 (D.Kan. Feb. 16, 1993)
(teacher's pension not deducted) (collecting cases).
The burden of proving mitigation is on the employer,
but that burden may be met by demonstrating that the
employee has refused other adequate employment or
has withdrawn from the labor market. *Phelps Dodge
Corp. v. NLRB,* 313 U.S. 177, 198-200 (1941);
*Tubari Ltd., Inc. v. NLRB,* 959 F.2d 451, 454 (3d
Cir.1992).

*1996-1997 School Year*

Plaintiff was wrongfully terminated from his admin-
istrator's position with the Chester Upland School
District before the 1996-97 school year. He then
sought, without success, an administrative job in a
number of other school districts. Because he was un-
able to locate an administrative position, plaintiff
spent the 1996-97 academic year as a teacher and
coach in the Philadelphia School District.

I find that plaintiff acted reasonably when he accep-
ted the teaching position with the Philadelphia School
District because his reasonable effort did not lead to
an administrator's position. The parties agree that
plaintiff's benefits as a Philadelphia teacher were not
substantially different from those he would have re-
ceived had he remained in his position with the
Chester Upland School District. His salary, however,
was substantially reduced, as he received only
$58,434 from the Philadelphia School District while
his Chester Upland salary would have been $80,767.
Damages for the 1996-97 school year are, thus,
$22,333.

*1997-98 and 1998-99 School Years*

Had he remained a teacher, plaintiff's 1997-98 salary
would have been $61,000. As a teacher, plaintiff
would have earned $84,461, in 1997-98 and the first
part of the 1998-99 school year.

During summer 1997, however, plaintiff elected to
retire from public school service and began collecting
his state-employee pension. He also took a cur-
riculum-design position with World Communications
and became an adjunct professor at Cheyney Uni-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                         Page 2
Not Reported in F.Supp.2d, 1999 WL 179693 (E.D.Pa.)
**(Cite as: 1999 WL 179693 (E.D.Pa.))**

versity. Not including the pension, these positions involved a further pay cut, and plaintiff earned a total of only $71,712 from September of 1997 until January 25, 1999. However, because the further pay cut was voluntary, plaintiff may not recover additional amounts caused by his pursuit of lower-paying opportunities.

**\*2** Plaintiff returned to work at the Chester Upland district on January 25, 1999. Defendants contend that damages should stop accruing two months earlier, however, because, they asked plaintiff to return on November 24, 1998. That offer was not extended until October, 1998, and plaintiff testified that he returned to the Chester Upland district as soon as he was able to complete his Fall 1998 semester commitments to Cheyney and World Communications. The nature of teaching, particularly at the university level, is that teachers are not necessarily free to relocate mid-semester. The semester-long obligations are reasonable in the industry, and plaintiff was thus entitled to complete the semester. Accordingly, the damage clock ran until January 25, 1999.

For 1997-98 and the first part of 1998-99, Chester Upland would have paid plaintiff $128,606. Had plaintiff remained with the Philadelphia School District, he would have earned $84,461. The damages for this period are thus $44,145, and the total amount of back pay owed is $66,478.

*Benefits*

Defendants are also responsible for pension and benefits payments. The parties agree, however, that the non-pension benefits provided by Chester Upland and Philadelphia districts are, for our purposes, equivalent. According to defendants' uncontradicted testimony, any back pay award will be accompanied by a pension contribution on plaintiff's behalf. Beyond the necessary pension payments, plaintiff is not entitled to additional damages for foregone benefits.

An order follows.

### ORDER
AND NOW, this 24th day of March, 1999, after argument on the record and substantial briefing, defendants are ordered to pay plaintiff $66,478 in back

pay. Defendants shall also make a pension contribution as if plaintiff had earned that amount as an educator.

The clerk of court is directed to close the case.

Not Reported in F.Supp.2d, 1999 WL 179693 (E.D.Pa.)

### Motions, Pleadings and Filings (Back to top)

• 2:96cv07162 (Docket) (Oct. 22, 1996)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE



Positive
As of: Feb 15, 2007

### JEFFREY VERDIN, Appellant v. WEEKS MARINE INC; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 25, Marine DIVISION; JOHN DOES 1-10, (said names being fictitious) ABC CORPORATIONS 1-100, (said corporations being fictitious)

#### No. 03-4571

### UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

#### 124 Fed. Appx. 92; 2005 U.S. App. LEXIS 2649

#### January 25, 2005, Submitted Under Third Circuit LAR 34.1(a)
#### February 16, 2005, Filed

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No. 01-cv-04598). District Judge: Honorable William H. Walls.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant employee sought review of an order of the United States District Court for the District of New Jersey, which granted appellee employer summary judgment on the employee's Title VII of the Civil Rights Act of 1964 and 42 U.S.C.S. § 1981 claims of race discrimination and retaliation.

**OVERVIEW:** The employee, a Native American, alleged that a master of the tug on which he worked encouraged him to drink alcohol as a result of his stereotypical beliefs and called him a derogatory name. The court affirmed the summary judgment granted the employer on the employee's Title VII and 42 U.S.C.S. § 1981 claims. The court agreed that incidents before May 16, 2000, were barred by the 300-day limitations period

because the Equal Employment Opportunity Commission charge on March 12, 2001, did not reflect a continuing violation and he exhausted administrative remedies only as to his May 2000 termination. The court held that the Title VII discrimination and retaliation claims failed because he did not show that non-Native American employees received more favorable treatment and a causal connection existed between his termination and engagement in protected activities. The 42 U.S.C.S. § 1981 claims that alleged incidents that occurred more than four years before the September 28, 2001, filing were time-barred. The court found no hostile work environment claim under § 1981 because many of the incidents were mere offensive utterances that he overheard and were not pervasive or regular.

**OUTCOME:** The court affirmed the order.

**CORE TERMS:** hostile work environment, statute of limitations, summary judgment, prima facie case, termination, tug, continuing violation, four-year, protected class, retaliation, pervasive, regular, time-barred, limitations period, prima facie claim, two-year, terminated, overheard, causal connection, adduced evidence, detrimentally, offensive, favorably, standard of review, arbitration award, discriminatory, racially, harassed, alcohol, recite

**COUNSEL:** For JEFFREY VERDIN, Appellant: Fred Shahrooz-Scampato, Westfield, NJ.

124 Fed. Appx. 92, *; 2005 U.S. App. LEXIS 2649, **

For WEEKS MARINE INC, Appellee: Patricia A. Smith, Ballard, Spahr, Andrews & Ingersoll, Voorhees, NJ.

**JUDGES:** Before: SCIRICA, Chief Judge, RENDELL and FISHER, Circuit Judges.

**OPINION BY:** RENDELL

**OPINION:**

[*93]  OPINION OF THE COURT

RENDELL, Circuit Judge.

Jeffery Verdin appeals the order of the District Court's grant of summary judgment to Weeks Marine, Inc. ("Weeks"), foreclosing him from proceeding with his Title VII and Section 1981 claims. Verdin contends that the District Court erred by failing to apply the continuing violation theory to his Title VII and Section 1981 claims. Furthermore, Verdin contends that he has set forth a prima facie claim for discrimination and has raised genuine issues of fact for both his hostile work environment and retaliation claims sufficient to defeat summary judgment. [**2]  We will affirm the grant of summary judgment in favor of Weeks.

[*94]  **I. Background**

As the parties are familiar with the facts, we will recite only those necessary to our determination. Verdin, a Native American, was formerly employed by Weeks from June 1997 to May 2000. Weeks is a large marine construction and dredging organization in the United States that operates over thirty tugboats ("tugs") in the waters off the coasts of North and South America, as well as in the Caribbean Sea. Employed as a First Captain of the Tug Matthew, Verdin alleges that Tug Master Mike Scheibe had an adversarial and harassing attitude which created a hostile working environment. Over the course of his employment with Weeks, Verdin alleges that a variety of discriminatory conduct occurred. While employed on the Tug Robert in 1998, Verdin asserts that Tug Master Ronald Bearb ("Bearb") encouraged him to drink alcohol as a result of Bearb's stereotypical belief that alcohol would subdue and placate Native Americans. Later that year, Verdin overheard Bearb recite a story about a Native American bar lounge where people acted like savages and were willing to cut each others throats over a 25-cent pool game. [**3]  n1

n1 Verdin does not claim that the word "savages" was used in the incident.

Weeks terminated Verdin's employment from the Tug Robert in 1998 due to escalating hostilities in his interaction with other personnel. Following this termination, Verdin successfully won an arbitration award granting reinstatement and full back pay with benefits.

In August of 1999, several months after the arbitration award, Verdin was reinstated on the Tug Robert. However, due to continuing problems with crew members, Verdin was transferred to the Tug Shelby. On April 25, 2000, the night prior to his transfer, Verdin overheard Bearb state, "I finally got rid of that nigger" to his son in a private conversation.

On May 6, 2000, Verdin threatened and harassed Scowman Phillip Clarke, a black South American, stating, "we don't like foreigners-we beat them with baseball bats in the head." The next day, May 7, 2000, he repeated the same comment over the tug's loudspeaker. Scowman Clarke's complaints led to an investigation with several [**4]  employees confirming the incident. As a result of the investigation, Verdin's employment with Weeks was terminated on or about May 23, 2000. Verdin denies that the incident ever occurred, arguing that the accusation was pretext for his racially motivated termination.

On March 12, 2001, Verdin filed a charge with the EEOC against Weeks alleging: (1) plaintiff was "constantly" referred to as a "nigger," creating a hostile work environment; (2) Weeks failed to promote him to Tug Master; (3) Weeks failed to redress his discrimination complaints; and (4) Weeks terminated him on May 23, 2000 because of his race and in retaliation for reporting Weeks to his union. Weeks moved for summary judgment on all claims. The District Court, finding that the majority of Verdin's claims were time-barred and the remainder failed to satisfy the requirements for a prima facie case, granted summary judgment on all claims.

The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

**II. Standard of Review**

Our standard of review of the District Court's entry of summary [**5]  judgment in favor of Weeks is plenary. *See Pacitti v. Macy's*, 193 F.3d 766, 772 (3d Cir. 1999); [*95]  *Hines v. Conrail*, 926 F.2d 262, 267 (3d Cir. 1991). A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the grant of summary judgment, we must affirm if the record evidence submitted by the non-movant "is merely colorable or is not significantly probative." *Anderson v. Lib-*

*erty Lobby, Inc.*, 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (citations omitted).

### III. Analysis

A. *Title VII Claims*

As the District Court noted, to pursue a Title VII claim, an individual has 300 days from the date of the discriminatory act to file a charge with the Equal Employment Opportunity Commission ("EEOC"). *See* 42 U.S.C. § 2000e-5(e). Absent a continuing violation, all discriminatory acts that are alleged [**6] to have occurred more than 300 days prior to the EEOC filing are time-barred. *See AMTRAK v. Morgan,* 536 U.S. 101, 113, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002). Verdin filed his EEOC charge on March 12, 2001; therefore, absent a continuing violation, all alleged incidents which occurred before May 16, 2000 are barred by the 300-day limitations period. We agree with the District Court that Verdin's charge does not reflect a continuing violation and that he exhausted his administrative remedies only as to his termination in May 2000.

To establish a prima facie claim for discriminatory termination, an employee must offer sufficient evidence that: (1) he was a member of the protected class, (2) he qualified for the position he sought, (3) he was fired, and (4) nonmembers of the protected class were treated more favorably. *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000). We agree with the District Court's conclusion that because Verdin has not adduced evidence demonstrating that non-Native American employees were treated more favorably, he cannot establish the fourth prong of a prima facie case for discrimination, and, consequently, this claim [**7] fails. Furthermore, even if he established a prima facie case, Verdin has not raised a genuine issue of material fact with regard to Weeks' stated reasons for his termination, *i.e.*, that he harassed a subordinate employee.

Verdin next asserts that he successfully established a prima facie case for retaliatory termination under Title VII. To establish a prima facie claim for retaliation, an employee must show he engaged in a statutorily protected activity, that the employer took adverse action against him, and that there is a causal connection between the two events. *See Goosby*, 228 F.3d at 323. We agree with the District Court's conclusion that this claim fails because Verdin has not adduced evidence that there was a causal connection between his termination and engagement in any protected activities.

Regarding Verdin's hostile work environment, to establish a prima facie case, he must show that: (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally

affected Verdin; (4) the discrimination would detrimentally affect a reasonable person of [**8] the same protected class in that position; and (5) the existence of respondeat superior liability. *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 [*96] (3d Cir. 1999). As Verdin relies on Bearb's 1998 comments and other incidents which occurred outside the May 16, 2000 filing period, these incidents are time-barred and Verdin's hostile work environment claim fails.

B. *Section 1981 Claims*

Regarding Verdin's Section 1981 claims, we use the same analysis in assessing the substantive merit of the claims and the applicability of a continuing violation theory that we apply for Title VII claims, except, at least with respect to the hostile work environment claim, there is a four-year statute of limitations. *See generally Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004). n2 As noted in the District Court's opinion, Verdin filed his Section 1981 claims on September 28, 2001. Upon application of a four-year limitations period and absent the application of a continuing violation theory, all events which occurred before September 28, 1997 are time-barred for the purposes of Verdin's Section 1981 claims. n3 As this [**9] limitations period corresponds with nearly all of Verdin's employment with Weeks, and Verdin cites no incidents prior to September 28, 1997, none of the incidents Verdin alleges are barred from consideration.

---

n2 The District Court applied a two-year statute of limitations to Verdin's Section 1981 claims. During the pendency of this appeal, however, the United States Supreme Court ruled that Section 1981 claims alleging a cause of action arising under an Act of Congress enacted after December 1, 1990 is governed by the federal "catch-all" four-year statute of limitations under 28 U.S.C. § 1658(a). *Jones*, 124 S. Ct. at 1845. Because hostile work environment, wrongful termination, and failure to transfer claims "arise under" the Civil Rights Act of 1991 in the sense that that Act defined the key "make and enforce contracts" language in Section 1981 to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b) (1991), these causes of action are governed by the four-year statute of limitations in 28 U.S.C. § 1658. *Id.* The *Jones* decision does not impact the substantive analysis of Verdin's claims because courts utilize the same analysis for the merits of Title VII and Section 1981 claims. *See McKenna*

*v. Pac. Rail Serv.*, 32 F.3d 820, 826 n.3 (3d Cir. 1994); *Watkins v. Nabisco Biscuit Co.*, 224 F. Supp. 2d 852, 873-74 (D.N.J. 2002).

[**10]

n3 For the reasons discussed *infra*, Verdin's Section 1981 claims lack substantive merit when applying either a four-year statute of limitations or a two-year statute of limitations, as the District Court applied. Consequently, we will assume, without deciding, that the four-year statute of limitations applies to all of Verdin's Section 1981 claims.

Regarding Verdin's hostile work environment claim, the same standard used under Title VII applies under Section 1981. *See McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 826 n.3 (3d Cir. 1994). Verdin contends that when all the incidents he alleges are assessed as a whole, the sum constitutes "pervasive and regular" discrimination. *See West v. Phila. Elec. Co.*, 45 F.3d 744, 753 (3d Cir. 1995). However, even when considering *all* the incidents Verdin alleges, *see supra* Part I, our conclusion is the same as that of the District Court-the comments and events that Verdin relies on to meet the pervasive and regular requirement do not demonstrate the ongoing pattern of racially offensive conduct that is required [**11] to show a prima facie case. The majority of the events which Verdin relies upon occurred in 1998, followed by a two-year gap and a final comment by Bearb on April 28, 2000. Many of these incidents were "mere offensive utterances" that Verdin overheard, *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998), and a time line of these incidents [*97] alone demonstrates that they were clearly neither pervasive nor regular. Without this element of a prima facie case, this claim fails.

Because Verdin's Section 1981 discrimination and retaliation claims are based on the same incidents and analyzed under the same standards as those of his coordinate Title VII claims, these claims fail for the same reasons the Title VII claims failed. *See supra* Part III.A.

**IV. Conclusion**

For the foregoing reasons, we will AFFIRM the District Court's order.

LEXSEE



Cited
As of: Feb 15, 2007

**HERMAN J. WOOLEY, Plaintiff, v. COLONIAL SCHOOL DISTRICT and
BOARD OF EDUCATION OF COLONIAL SCHOOL DISTRICT, Defendants.**

**Civil Action No. 91-407 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**1993 U.S. Dist. LEXIS 19110**

**May 11, 1993, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employers filed a motion to include in the jury charge an instruction on failure to mitigate damages in plaintiff employee's action for race discrimination under Title VII, 42 U.S.C.S. § 200e et seq., and under 42 U.S.C.S. § 1981, and for age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C.S. § 623.

**OVERVIEW:** The employee claimed that the employers discriminated against him on the basis of his race and age when he was denied a promotion. After the denial, the employee never applied for any other promotions or other employment. The employers, therefore, requested that the jury be given a failure to mitigate damages jury instruction in the employee's employment discrimination action. The court granted that request, finding that Title VII, 42 U.S.C.S. § 20000e et seq., expressly contained a provision requiring the mitigation of damages, 42 U.S.C.S. § 200e-5(g), and that a similar duty had been applied by courts under the ADEA, 29 U.S.C.S. § 623, and 42 U.S.C.S. § 1983. The court also found that while it was normally the employer's duty to prove both the availability of other similar positions and the employee's failure to apply for them, the availability of other positions was irrelevant where the employee failed to apply for any positions. Thus, the employer was entitled to a jury instruction on the employee's failure to mitigate his damages.

**OUTCOME:** The court granted the employers' request for a failure to mitigate damages charge.

**CORE TERMS:** mitigate, mitigation, duty to mitigate, substantially equivalent, reasonable diligence, discriminated, comparable, back-pay, interim, earnings, express provision, jury instruction, pretrial, altered, set-off, promotion, salary

**COUNSEL:** [*1] Joseph M. Bernstein, Esq., Wilmington, Delaware; attorney for plaintiff.

David H. Williams, Esq., and Peter C. Campbell, Esq., of Morris, James, Hitchens & Williams, Wilmington, Delaware; attorneys for defendants.

**JUDGES:** SCHWARTZ

**OPINION BY:** MURRAY M. SCHWARTZ

**OPINION:**

**MEMORANDUM OPINION**

Dated: May 11, 1993
Wilmington, Delaware

**SCHWARTZ, Senior District Judge**

Currently before the Court is a pretrial request from the defendants, the Colonial School District and Board of Education of the Colonial School District, to include in the jury charge an instruction on failure to mitigate damages. Plaintiff alleges defendants unlawfully discriminated against him because of his race under 42 U.S.C. § 2000e-2 (1988) (Title VII) and under 42 U.S.C. § 1981.

D.I. 1 at PP 1-10. Plaintiff also alleges unlawful discrimination based on age under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623. As part of their defense, defendants [*2] assert plaintiff failed to mitigate his damages as required by law and now seek a jury instruction on failure to mitigate. Such an instruction would allow the jury to consider plaintiff's attempts, or lack of attempts, to mitigate damages by seeking higher-paying employment. Unlike cases in which plaintiff made efforts to mitigate and the issue of the mitigation's extent arises, defendants here assert plaintiff failed to mitigate. If the jury were to find plaintiff failed to mitigate, plaintiff will have forfeited any putative back pay award. For the reasons which follow this Court will grant the defendants' request and will instruct the jury on mitigation of damages.

### I. Facts

Plaintiff, Herman J. Wooley, alleges defendants discriminated against him by denying him the position of "Supervisor of Maintenance and Operations" on June 27, 1990. D.I. 1 at P 7(e). The position carried with it a yearly salary between $ 58,851.00 and $ 64,205.00. D.I. 37 at 4. Before, during and after the alleged discrimination, plaintiff, employed by the Wilmington Housing Authority (WHA), has earned between $ 32,250.38 and $ 32,896.50 per year. D.I. 37 at 4. n1 After being denied the position with [*3] the defendants, plaintiff made a single attempt at promotion within WHA, but withdrew his application because the position was not securely funded. D.I. 49 at A-3, A-4. Besides this one attempt, plaintiff has not applied for any other employment. D.I. 49 at A-4.

n1 The respective salary figures are based on the stipulation of facts contained in the parties' pretrial order. D.I. 37. The figures represent the years 1990, 1991 and 1992.

### II. Discussion

Of the three statutory grounds of plaintiff's complaint, only Title VII contains an express provision which requires mitigation of damages. 42 U.S.C. § 2000e-5(g). That provision requires "interim earnings or amounts earnable with reasonable diligence by the person . . . discriminated against shall operate to reduce the back pay otherwise available . . . ." 42 U.S.C. § 2000e-5(g) (1988). To fulfill this statutory duty, a plaintiff must use "reasonable diligence to find other employment." [*4] Ford Motor Co. v. EEOC., 458 U.S. 219, 231, 73 L. Ed. 2d 721, 102 S. Ct. 3057 (1982).

Neither the ADEA nor § 1981 contain an express mitigation-of-damages provision. However, the United States Court of Appeals for the Third Circuit has applied mitigation of damages in ADEA cases. See, e.g., Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1005 (3d Cir. 1988) (stating defendant in ADEA case must show plaintiff failed to exercise reasonable diligence to seek substantially equivalent employment); Rodriguez v. Taylor, 569 F.2d 1231, 1243 (3d Cir. 1977) (finding "the absence of express set-off language in the ADEA enforcement provisions does not compel the inference that Congress intended to preclude set-offs"), cert. denied, 436 U.S. 913, 56 L. Ed. 2d 414, 98 S. Ct. 2254 (1978). While § 1981 also does not contain an express provision requiring plaintiff to mitigate damages, the Third Circuit had held the legal standards governing Title VII and § 1981 are interchangeable. Gunby v. Pennsylvania Elec. Co., 840 F.2d 1108, 1115 n.9 (3d Cir. 1988), cert. denied, 492 U.S. 905, 106 L. Ed. 2d 564, 109 S. Ct. 3213 (1989). [*5]

While mitigation is plaintiff's duty, "it is the defendant's burden to establish that plaintiff failed to mitigate his damages in order to successfully limit plaintiff's back-pay award." Carden v. Westinghouse Elec. Corp., 850 F.2d at; Robinson v. Southeastern Pennsylvania Transp. Authority, Red Arrow Div., 982 F.2d 892, 897 (3d Cir. 1993). Defendants may satisfy this burden by showing "other substantially equivalent positions were available to [plaintiff] and he failed to use reasonable diligence in attempting to secure such a position." Anastasio v. Schering Corp., 838 F.2d 701, 708 (3d Cir. 1988) (citations omitted and emphasis added). n2 See Wehr v. Burroughs Corp., 619 F.2d 276, 278 n.3 (3d Cir. 1980) (defendant's burden to show both plaintiff's failure to exercise reasonable diligence and reasonable likelihood that plaintiff would have found comparable work).

n2 As the appellate court explained in Anastasio, defendant could also satisfy the burden by showing "it offered [plaintiff] a job that was substantially equivalent" to the disputed position. Anastasio, 838 F.2d at 708. This means of satisfying the burden is not at issue in this case.

[*6]

Defendants do not argue that they are prepared to satisfy both criteria. Instead, defendants argue that if they show plaintiff made no effort to mitigate damages, they are relieved of the burden to show "other substantially equivalent positions were available". Anastasio, 838 F.2d at 708. To support their argument, defendants rely upon a case arising under the National Labor Relations Act (NLRA). Tubari Ltd., Inc. v. NLRB, 959 F.2d 451,

459 (3d Cir. 1992). In Tubari, the United States Court of Appeals for the Third Circuit stated, "although [defendant] has not submitted proof that other work was available and it is normally the employer's burden to establish this element of mitigation . . . this is irrelevant where, as here, the [plaintiff] made no search for comparable interim employment." Id.

While other courts have likewise altered the defendant's burden in discrimination cases, see, e.g., Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1527 (11th Cir. 1991); Sellers v. Delgado Community College, 839 F.2d 1132, 1139 (5th Cir. 1988), the [*7] Court of Appeals for the Third Circuit has only altered the defendant's burden in Tubari in the NLRA context involving a back-pay award to striking workers. The issue then becomes whether to treat the duty to mitigate differently in discrimination cases than in NLRA cases.

The mitigation provision of the NLRA "served as the model for Title VII's back-pay provisions." Maxfield v. Sinclair Int'l., 766 F.2d 788, 793 (3d Cir. 1985), cert. denied, 474 U.S. 1057, 88 L. Ed. 2d 773, 106 S. Ct. 796 (1986). It is not surprising, therefore, that courts have treated the duty to mitigate similarly under Title VII and the NLRA. For instance, in outlining the duty to mitigate under Title VII in Ford Motor Co. v. EEOC, the Supreme Court relied extensively on cases arising under the NLRA. Ford Motor Co. v. EEOC, 458 U.S. 219, 231-34, 73 L. Ed. 2d 721, 102 S. Ct. 3057. While this legal similarity alone may justify extension of Tubari into civil rights cases, support for altering the rationale for the mitigation of damages doctrine also supports extending the doctrine.

In a NLRA case, upon which the Supreme Court relied in Ford Motor Co. v. EEOC, that Court, by [*8] Justice Frankfurter, explained the reasoning behind mitigation of damages:

Making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the [National Labor Relations] Board enforces. Since only actual losses should be made good, it seems fair that deductions should be made not only for actual earnings by the worker but also for losses he willfully incurred.

Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197-98, 85 L. Ed. 1271, 61 S. Ct. 845 (1941) quoted in Ford Motor

Co. v. EEOC, 458 U.S. at 231, n.15. In considering what amounts to "actual damages", it is difficult to justify awarding plaintiff those damages which plaintiff himself could have avoided and a statute, or case law, requires him to avoid. Unlike the lost earnings incurred because of discrimination, the losses incurred by plaintiff's failure to mitigate are incurred at plaintiff's own choice. When a plaintiff chooses not to seek better employment, the loss of earnings he suffers occurs at his hands, and the law does not compensate such injury. n3

n3 This reasoning would not apply when plaintiff had a legitimate reason for not seeking other employment. For instance, in denial of promotion cases, courts have recognized that plaintiff should not have to jeopardize seniority or status with the company in order to mitigate damages. See, e.g., EEOC v. Safeway Stores, Inc., 634 F.2d 1273, 1285 (10th Cir. 1980) (finding plaintiff's decision to remain "secure in a long-term position" was "prudent under the circumstances"), cert. denied sub nom. Safeway Stores, Inc. v. Crespin, 451 U.S. 986, 68 L. Ed. 2d 844, 101 S. Ct. 2321 (1981). Such reasoning, applicable in failure to promote cases, does not apply to plaintiff's claim for failure to hire. See Jurgens v. EEOC, 903 F.2d 386, 389 n.4 (5th Cir. 1990) (finding duty to mitigate satisfied by remaining on the job in failure to promote case and expressly distinguishing cases of "persons not in an existing relationship with the discriminating employer"). Similarly, there could be other factual scenarios which would excuse the duty to mitigate.

[*9]

In light of plaintiff's decision not to seek other employment, defendants are entitled to a jury instruction on failure to mitigate regardless of the availability of equivalent work. Plaintiff's decision to remain in his current employment makes it pointless for defendants to offer evidence of the potential job opportunities plaintiff may have found. No matter what opportunities awaited plaintiff, plaintiff had made his choice not to seek them out. As in Tubari, evidence of the work available is "irrelevant where, as here, the [plaintiff] made no search for comparable interim employment." 959 F.2d at 459.

For the foregoing reasons, the Court will grant defendants' request that the jury be allowed to decide whether plaintiff failed to mitigate damages when he chose to remain at his current position.